Argued and submitted August 3, 2011, affirmed May 31, petition for review allowed December 27, 2012 (353 Or 127)

Charles NOBLE
and Deborah Noble,
*Petitioners,*

*v.*

DEPARTMENT OF FISH AND WILDLIFE,
*Respondent,*

*and*

Robert LYTLE
and Galena Stoyan,
*Respondents below.*

Department of Fish and Wildlife
700142; A140936

279 P3d 345

Brian J. Posewitz argued the cause and filed the briefs for petitioners.

Denise G. Fjordbeck, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, David B. Thompson, Interim Solicitor General, and Erika L. Hadlock, Senior Assistant Attorney General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Petitioners, who own property on a small stream near Oregon City, seek review of a final order of the Oregon Department of Fish and Wildlife (ODFW) approving fishways[1] on two downstream dams owned by Lytle and Stoyan, respectively. Petitioners assign as error ODFW's conclusion that fish require passage at the Lytle and Stoyan dams only when water flows over the spillways of the dams. We conclude that ODFW correctly construed the fish passage requirements in OAR 635-412-0035 to require fish passage over those dams only when there is water in their channel-spanning fishways. Consequently, we affirm.

We take the following undisputed facts from ODFW's final order and from the record in the contested case hearing. This dispute involves an unnamed stream that ultimately flows into Beaver Creek, a tributary of the Willamette River. The channel of the stream is about three to four feet wide. Historically, migratory fish, including cutthroat trout, have been present in the stream. In addition, cutthroat trout likely are present in the upper portions of Beaver Creek.

In its early stages, the stream flows through petitioners' property and then continues downstream through the properties of Wacker, Olson, Lytle, Stoyan, and Hillison, in that order. Near the boundary of the Wacker and Olson properties, an unnamed tributary joins the stream. Artificial obstructions in the stream have created four ponds: the Wacker pond, the Lytle pond,[2] the Stoyan pond, and the Hillison pond. At certain times of the year, no water flows downstream from the Wacker pond. In addition, as a consequence of the senior water right associated with the Wacker pond and natural variations in rainfall and other factors, at

---

[1] OAR 635-412-0005(20) defines "fishway" to mean

"the set of human-built and/or operated facilities, structures, devices, and measures that together constitute, are critical to the success of, and were created for the sole purpose of providing upstream fish passage at artificial or natural obstructions which create a discontinuity between upstream and downstream water or bed surface elevations."

[2] The Lytle pond extends onto the Olson property. For convenience, we refer to it simply as the "Lytle pond."

times, the stream does not flow into the Lytle and Stoyan ponds.

The Lytle and Stoyan ponds were created by artificial dams. The dams were constructed without permits "in the relatively remote past," but the Water Resources Department (WRD) has since issued permits for the dams. Each dam is a maximum of five feet high. At the time of the order, efforts to contest WRD's issuance of the Lytle permit were ongoing.

Under their WRD permits, Lytle and Stoyan each have the right to appropriate water from the stream during late fall through spring—the rainy season, basically—and to store up to one acre foot of water behind their dams. The Lytle permit allows appropriation from November 1 through May 31 of each year; the Stoyan permit allows a longer period, from November 1 through June 30. Both permits provide that "[t]he permittee shall pass all live flow outside the storage season described above."

The permitted use "may be made only at times when sufficient water is available to satisfy all prior rights, including prior rights for maintaining instream flows." To that end, the WRD permits require "the installation and maintenance of an outlet pipe, or the provision of other means to evacuate water when determined necessary by the Water Resources Director to satisfy prior downstream rights." In the Lytle dam, the outlet pipe is about 18 inches below the fishway. The record does not identify the location of the outlet pipe in the Stoyan dam.

The WRD permits also require installation of fish passage facilities approved by ODFW. Each permit states:

> "The permittee shall not construct, operate or maintain any dam or artificial obstruction to fish passage in the channel of the subject stream without providing a fishway to ensure adequate upstream and downstream passage for fish. The applicant is hereby directed to contact an [ODFW] Fish Passage Coordinator before beginning construction of any in-channel obstruction."

ODFW determined that the dams required fishways, and Lytle and Stoyan created fishways on and below their respective dams.

The Lytle and Stoyan fishways are "channel-spanning" fishways that lead up to each dam's spillway. A channel-spanning fishway is a fish passage structure that occupies the entire channel. The Lytle fishway consists of "various sized rocks leading in a ramp configuration up to the top of the Lytle dam, where a channel with a flat bottom and vertical sides, with rock in the bottom of the channel, crosses the top of the Lytle dam to the Lytle pond." The Stoyan fishway is a series of weirs[3] descending from the top of the dam. The ODFW fish passage coordinator, Tom Stahl, testified that these are "full channel-spanning structures."

Each fishway will provide fish passage when there is water moving through the new stream channel, but such water movement does not occur year-round at either dam. In November 2006, after an ODFW staff biologist inspected the fishways, Stahl issued letters approving the Lytle and the Stoyan fishways and requiring maintenance of the fishways as approved.

Petitioners would like fish to come through the stream on their property, and the kind of fishways that ODFW approved on the Lytle and Stoyan dams is the key factor in petitioners' challenge to the propriety of ODFW's final order. In ODFW's view, which petitioners dispute, the nature of the fishways necessitated that they would provide fish passage only when the stream was flowing high enough to go through the spillways on the dams.

Petitioners sought reconsideration of each fishway approval. At a contested case hearing, Stahl explained that water flow does not include water "called" by the watermaster to satisfy a downstream water right: "We're not considering that live streamflow because it's been stored * * * for water diversion purposes or water usage purposes." Thus, ODFW did not consider any flow through the outlet pipes, as

---

[3] A "weir" is a structure that is built to provide grade stabilization in a stream channel, usually using rocks in a V shape to provide a stair-step effect for fish to cross.

may be ordered by the watermaster, as a part of the fishway. Stahl also acknowledged that, if live flow came into the Lytle pond but then evaporated, that water would not go through the fishway and would not be considered as streamflow.

The administrative law judge (ALJ) issued a proposed order denying petitioners' motions for reconsideration. Petitioners filed exceptions, and ODFW issued a final order on reconsideration that modified some aspects of the ALJ's proposed order and affirmed the approval of the Lytle and the Stoyan fishways. In its final order, ODFW reasoned that it could not modify the water rights WRD granted to Lytle and Stoyan. And, under ODFW's interpretation of its rules, "fish require passage at these facilities year-round, but *only* when there is adequate flow in the system to allow migration through it." (Emphasis in original.)

ODFW rejected, as contrary to the definition of "stream," petitioners' argument that the streamflow includes all water that enters the Lytle property above the Lytle dam. ODFW reasoned:

"All passage evaluations for dams, whether or not [the dam] is constructed, must take into account the dam, otherwise there would be no way to determine whether the fishway provided passage at the dam.

"Thus, because the 'stream' is the water moving through the system, all [ODFW] needed to do is establish that fish could pass through the Stoyan and Lytle fishways when water was moving through the system, and therefore, through the fishways."

Petitioners seek review and present a challenge to ODFW's rules relating to migratory fish passage through channel-spanning fishways. Petitioners make six arguments as to why ODFW erred by approving the fishways: (1) ODFW incorrectly excluded stored water flow from its calculation of design streamflow range under OAR 635-412-0035(2)(a); (2) ODFW's determination that all other flows will go over the spillways is not supported by substantial evidence; (3) ODFW's interpretation of "high fish passage design flow," OAR 635-412-0005(26), and "low fish passage design flow," OAR 635-412-0005(30), is inconsistent with the general requirements for fish passage under OAR 635-412-0035(1);

(4) ODFW lacked substantial evidence that fish passage was required for a period less than year-round; (5) interpreting "stream" to mean only the water that flows over the top of a dam is not plausible; and (6) if ODFW's rules require fish passage only when water goes over the spillways, then its rules are inconsistent with the statute. In other words, and in general terms, petitioners primarily argue that ODFW incorrectly calculated the amount of water flowing into the system, which led it to determine, erroneously, that the Lytle and Stoyan fishways were adequate to allow migratory fish to pass. Also, petitioners assert that ODFW mischaracterized the periods of the year when fish passage is required based on an incorrect interpretation of its own rules. Finally, petitioners contend that, if we decide that ODFW complied with its own rules, then those rules are inconsistent with the fish passage statute.

ODFW responds that petitioners are offering "a backdoor challenge" to the WRD permits. According to ODFW, petitioners' arguments boil down to the contention "that a dam's fish-passage facility is inadequate—as a matter of law—if that dam ever prevents water from flowing freely downstream," but that is inconsistent with statutes that authorize WRD to permit water storage by way of dams. Furthermore, in ODFW's view, the fish passage rules apply differently to channel-spanning fishways than to fish ladders and other systems that use only a portion of the water flowing past a dam. As a result, ODFW argues, it "simply defined the 'design streamflow range' as *all* streamflows that pass over the dam, rather than as some subset of those flows. Thus, for channel-spanning fishways, ODFW focuses on ensuring that *whenever* a stream is moving past a dam, fishways will operate to facilitate passage." (Emphasis in original.)

As defined by the parties, the primary dispute is whether ODFW properly construed its rules concerning fish passage, and, if so, whether the rules are consistent with a statute governing fish passage. An agency's interpretation of its own rule will be affirmed if the interpretation is plausible and "cannot be shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law[.]" *Don't Waste Oregon Com. v. Energy*

*Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). When interpreting administrative rules, our objective is to determine the intent of the body that promulgated the rule. *Willamette Oaks, LLC v. City of Eugene*, 232 Or App 29, 33-34, 220 P3d 445 (2009). We apply the same analytical framework that applies when we construe a statute. *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010). "At the first level of analysis, we examine the text and context of the rule to discern the intent of the agency." *Id.* at 110. We review the agency's interpretation of laws for legal error and its factual findings for substantial evidence. ORS 183.482(8)(a), (c). Substantial evidence for a finding of fact exists if the record, taken as a whole, would allow a reasonable person to make that finding. *Einstein v. PSRB*, 330 Or 121, 127, 998 P2d 654 (2000).

We begin by outlining the statutory and regulatory schemes that govern fish-passage facilities. The applicable statute governing fish passage for native migratory fish in Oregon, ORS 509.585, provides, in part:

"(1)   It is the policy of the State of Oregon to provide for upstream and downstream passage for native migratory fish and the Legislative Assembly finds that cooperation and collaboration between public and private entities is necessary to accomplish the policy goal of providing passage for native migratory fish and to achieve the enhancement and restoration of Oregon's native salmonid populations, as envisioned by the Oregon Plan. Therefore, except as provided in ORS chapter 509, fish passage is required in all waters of this state in which native migratory fish are currently or have historically been present.

"* * * * *

"(4)   A person owning or operating an artificial obstruction shall, prior to * * * fundamental change in permit status * * * obtain a determination from [ODFW] as to whether native migratory fish are or historically have been present in the waters. If [ODFW] determines that native migratory fish are or historically have been present in the waters, the person owning or operating the artificial obstruction shall either submit a proposal for fish passage to [ODFW] or apply for a waiver pursuant to subsection (7)

of this section. Approval of the proposed fish passage facility or of the alternatives to fish passage must be obtained from [ODFW] prior to * * * permit modification * * *."

In accordance with ORS 509.585(4), ODFW determined that cutthroat trout, native migratory fish, were present in the stream and required passage through the Lytle and Stoyan dams. Petitioners accept that determination.

In a different subsection of ORS 509.585, the legislature has delegated authority to the State Fish and Wildlife Director to adopt rules establishing "criteria for determining the adequacy of fish passage," including, but not limited to, the "feasibility of fish passage and alternatives to fish passage." ORS 509.585(7)(c)(F). The ODFW rule governing fish passage criteria is OAR 635-412-0035. Both parties agree that the Stoyan and Lytle dams fall under the requirements of OAR 635-412-0035(2), which provides specific criteria for "fish passage at dams and other artificial obstructions which create a discontinuity between upstream and downstream water surface or streambed elevations."

One criterion in that rule requires fishways to "provide fish passage at all flows within the design streamflow range." OAR 635-412-0035(2)(a). According to petitioners, ODFW approved the Lytle and Stoyan fishways because it in part misconstrued the criterion in OAR 635-412-0035(2)(a). Petitioners' first, third, and fifth arguments implicate ODFW's interpretation of the rule and related definitions. Although we briefly describe petitioners' arguments concerning the requirements in OAR 635-412-0035(2)(a), their arguments are fatally flawed because ODFW properly determined that those requirements do not apply to the channel-spanning fishways at issue in this case.

In simplified terms, OAR 635-412-0035(2)(a) requires a fishway, during the period when ODFW determines that native migratory fish require passage, to allow fish to pass at all times except for those times when the flows within the stream are at their lowest and highest—namely, the lowest five percent and the highest five percent of the mean daily average discharge—but not counting days when the stream does not flow.[4] By virtue of the definition of

---

[4] Pursuant to the applicable definitional rule, "design streamflow range" as used in OAR 635-412-0035(2)(a) means "the range of flows within a stream,

"design streamflow range," the term "streamflow" refers to "flows within a stream," OAR 635-412-0005(13), but neither "streamflow" nor "flows" is further defined in OAR 635-412-0005, the definitional rule.

ODFW interpreted "streamflow" in a stream with a dam and channel-spanning fishway as referring to "the water moving through the system," *i.e.*, it considered streamflow to be only the water moving over the dams and through the fishways, not water that flowed into the ponds above the dams. ODFW then determined that fish passage at each of the dams was simply required throughout the year whenever there was enough water to flow over the dam, without need to numerically calculate the lowest and highest flows, and that Lytle and Stoyan had met the requirements for fish passage. Petitioners contend that the proper interpretation of "streamflow" includes water that enters the ponds behind the Lytle and Stoyan dams but that then evaporates or seeps into the ground rather than passing downstream. Petitioners also contend that streamflow must include any water that passes through the outlet pipes in the dams to downstream users with priority over the water.

We agree with ODFW that its interpretation of the term "streamflow" is plausible. First, the definitions of "stream" and "channel," which refer to moving waters, supports ODFW's focus on the water moving through the dam and spillway rather than water that is stored behind the dam. A stream is defined as "a body of running waters of this state *moving over the surface of the land* in a channel or bed including stream types classified as perennial or intermittent and channelized or relocated streams." OAR 635-412-0005(39) (emphasis added). Likewise, a channel means "a waterway that periodically or continuously contains *moving waters of this state* and has a definite bed and banks that

---

bracketed by the Low Fish Passage Design Flow and the High Fish Passage Design Flow, for which a fishway shall provide fish passage." OAR 635-412-0005(13). "Low fish passage design flow" is defined, in turn, as "the mean daily average stream discharge that is exceeded 95 percent of the time, excluding days with no flow, during the period when [ODFW] determines that native migratory fish require fish passage." OAR 635-412-0005(30). On the other end of the scale, "high fish passage design flow" is defined as "the mean daily average stream discharge that is exceeded 5 percent of the time during the period when [ODFW] determines that native migratory fish require fish passage." OAR 635-412-0005(26).

serve to confine the water." OAR 635-412-0005(7) (emphasis added). ODFW could plausibly construe its rule to exclude from the range of flows in the stream any water that comes in behind the dam that evaporates or soaks into the earth; such water is no longer part of "a body of running waters of this state moving over the surface of the land," OAR 635-412-0005(39), and thus is not part of the stream.

Second, Stahl's explanation of ODFW's development of OAR 635-412-0035(2)(a), along with a separate rule for channel-spanning fishways, OAR 635-412-0035(2)(k)(C), supports ODFW's interpretation of "streamflow." During the contested case hearing, Stahl testified that, when the fish passage rules were first developed in 2005, the most common type of fish passage systems were fish ladders, which divert a portion of the water passing through a dam to allow steps for fish to safely cross the dam. He testified that the "design streamflow range" requirements under OAR 635-412-0035(2)(a) were relevant to those fish ladders because sufficient water had to be diverted to the fish ladders to allow fish to pass through:

> "most of the criteria in [OAR 635-412-0035(2)] are for fish ladders which is where you would be putting on a specific type of structure that doesn't take the entire channel's flows through it and therefore, within those design flows you're trying to make sure that you get enough water through that side structure. If you're talking about you[r] fishway is now your entire channel, you're not as worried about that because flows are moving through that."

Stahl explained that channel-spanning fishways, in contrast to a fish ladder on a portion of a dam, utilize virtually *all* of the streamflow to allow fish to safely cross the dam. Accordingly, there is no need to calculate design streamflow range for channel-spanning fishways. He explained that whenever there is sufficient water to flow through the dam, there is fish passage, and so calculating streamflow range would be a fruitless exercise. Thus, ODFW does not require flow calculations for channel-spanning fishways.

Instead, fish passage requirements for channel-spanning fishways are provided in OAR 635-412-0035(2)(k)(C):

"Fish passage plans for *stream channel-spanning* weirs, roughened channels (including but not limited to nature-like, rock, or engineered-stream fishways), and * * * [other fishways not relevant here] shall clearly demonstrate how water depths, water velocities, water drops, jump pools, structure sizing, and fish injury precautions shall provide fish passage."

(Emphasis added.) ODFW notes, and we agree, that petitioners do not challenge ODFW's conclusion that the Lytle and Stoyan fishways, respectively consisting of a roughened channel and a weir system, comply with OAR 635-412-0035(2)(k)(C).

Indeed, Stahl approved the Lytle and Stoyan fishways using the channel-spanning fishway requirements. In Stahl's letter to Lytle he wrote:

"The fishway includes a 'roughened channel' which back-waters to a six-inch depth, and provides passage up to a concrete spillway in which 'oversized rock' were placed. The spillway controls stream outflow from the pond. The back-water situation, in conjunction with the over-sized rock, will provide adequate water velocities and depth for fish passage through the spillway in this stream."

(Footnotes omitted.) Stahl's letter to Stoyan stated:

"The fishway includes five channel-spanning rock weirs, with an elevation drop of six inches and an engineered streambed between each of them. ODFW * * * staff recently assessed the fishway and found that it is functioning properly."

Stahl's fishway approval letters to both Lytle and Stoyan clearly demonstrated "how water depths, water velocities, water drops, jump pools, structure sizing, and fish-injury precautions" provide adequate fish passage. Hence, the record shows that the Lytle and Stoyan fish passage structures meet the fish passage requirements of channel-spanning fishways.

Because ODFW determined that the Lytle and Stoyan fishways were channel-spanning, it also did not consider streamflow through outlet pipes. To do so would render superfluous OAR 635-412-0035(2)(k)(C). If water flowing

through outlet pipes is to be considered in the design stream-flow, then by definition there could be no channel-spanning weirs or other channel-spanning fishways because *all* of the stream would not be spanning the fishway; rather, some of the streamflow would pass through the outlet pipe. And because WRD requires every dam to have an outlet pipe, OAR 690-020-0025,[5] any rule providing criteria for channel-spanning fishways would be superfluous. As a general rule, we assume the rulemaking authority did not intend portions of an enactment to be superfluous. *State v. Stamper*, 197 Or App 413, 418, 106 P3d 172, *rev den*, 339 Or 230 (2005); *Hogevoll*, 348 Or at 109 (applying the same analytical frame-work in construing administrative rules that apply to the construction of statutes). Accordingly, we do not construe ODFW's fish passage rules for channel-spanning structures to require streamflow calculation of water flowing through outlet pipes that WRD requires and controls.[6] We conclude that ODFW's interpretation of streamflow to include only the water that flows over the top of the dam and through the fish-way is plausible and consistent with its own administrative rules.

In petitioners' second and related argument, they contend that ODFW's determination that all flows other than stored water will go over the spillway is not supported by sub-stantial evidence. Their two-step argument is that because water must pass through the outlet pipes whenever the dam owners reach their water reservoir limit for the year or when WRD directs them to release water to satisfy a downstream owner's water rights, and there is evidence that, at times, the Lytle and Stoyan ponds are full when the Hillison pond is empty, then Lytle or Stoyan or both may be required to

---

[5] General requirements for all dams are found in OAR 690-020-0025, which provides:

"(6) An outlet conduit with a minimum diameter of 8" must be installed in any instream reservoir to permit drainage of the reservoir and for passage of flow to downstream prior rights. * * *."

[6] Petitioners suggest that Lytle and Stoyan could decide to release water through their outlet pipes on their own so that the water would not pass over the spillways on their dams and fish could not pass. ODFW notes that it considers any such intentional diversion of water, absent a watermaster's directive to open the outlet pipe, to be a violation of the terms of the ODFW letters approving the fishways.

release some water through the outlet pipe on his dam. Whether that scenario actually occurs or not, petitioners' second argument is irrelevant, because ODFW construed streamflow to include only the water going over the spillway, and we have concluded that ODFW's construction of streamflow is plausible and consistent with its own rules.

We turn to petitioners' fourth argument, that ODFW should have required each dam to provide fish passage year-round, regardless of whether water is flowing over the dam, based on its own rules. As explained above, fishways must provide fish passage at all flows within the design streamflow range, OAR 635-412-0035(2)(a), and design streamflow range is the range of flows bracketed by the high and low "fish passage design flow." OAR 635-412-0005(13). Both "high fish passage design flow" and "low fish passage design flow" are measured by the mean daily average stream discharge "during the *period* when [ODFW] *determines* that native migratory fish require fish passage." OAR 635-412-0005(26), (30) (emphasis added). Petitioners contend that the "period" refers to OAR 635-412-0035(1), which provides, in part:

"(a) Unless the owner or operator of an artificial obstruction chooses to provide year-round fish passage for all native migratory fish and life history stages, [ODFW] shall determine:

"(A) Native migratory fish currently or historically present at the site which require fish passage;

"(B) Life history stages which require fish passage; and

"(C) Dates of the year and/or conditions when passage shall be provided for the life history stages and native migratory fish."

In petitioners' view, ODFW has only two options for the period when fish passage is required: (1) ODFW must require fish passage year-round, or else (2) ODFW must determine the periods when fish passage is required based on the criteria set forth in OAR 635-412-0035(1)(a)(A) to (C). According to petitioners, any other interpretation would not be plausible. Thus, they conclude, because ODFW did not determine

life history stages that require fish passage, OAR 635-412-0035(1)(a)(B), ODFW must require fish passage year-round but has not done so.

ODFW responds that it has required fish passage year-round, but interpreted "year-round fish passage" in OAR 635-412-0035(1)(a) to require passage at all times when water is flowing through the channel-spanning fishways; thus, no fish-specific life histories and time periods for migration need be determined. ODFW argues that its caveat—"as long as the stream's flowing"—is not a determination of a time period that would trigger the specific fish-type, life history, and time period determinations required by OAR 635-412-0035(1)(a)(A) to (C). Rather, it explains, the caveat is a practical assessment of year-round fish passage that is consistent with the nature of a channel-spanning fishway: When a stream has a sufficient quantity of water, it will flow through the channel and, thus, the fishway. The determinations required by OAR 635-412-0035(1)(a)(A) to (C), ODFW argues, apply most directly to fish ladders and similar fish passage facilities on larger dams that require diversion of some of the water at the dam for the fish passage facility.

We agree with ODFW that its interpretation of "year-round fish passage" in this case is a plausible one. Regardless of how well designed a channel-spanning fishway is, without water flowing through it, fish passage is not possible. By virtue of the dams on the stream, as well as weather variations, streamflow slows and stops at various times during the year. When water has stopped flowing through the stream because of upstream water rights, weather, or Lytle's and Stoyan's right to store water, fish migration necessarily is not occurring. ODFW's interpretation of year-round fish migration at a channel-spanning fishway properly takes into account the difference between channel-spanning fishways, where either there is water or there is not, and the kinds of fishways that divert some water behind the dam for the fishway. Therefore, we conclude that ODFW plausibly construes year-round fish passage in OAR 635-412-0035(1), as applied to a channel-spanning fishway, to mean passage at all times when water is flowing through the fishway.[7]

---

[7] We therefore need not address ODFW's argument that petitioners, in reality, are mounting a collateral challenge to WRD's issuance of permits to Lytle and

In the alternative, petitioners contend that ODFW's determination that fish passage was not required year-round lacked substantial evidence. Petitioners argue that ODFW did not look at the stream and instead improperly assumed that at times there was no flow through the stream above or below the Lytle and Stoyan fishways and, hence, that at some points during the year there was no fish migration. Substantial evidence exists if, reviewing the whole record, the agency's finding is reasonable. *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988). The court "shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion." ORS 183.482(7). Here, the record shows that the stream is intermittent, that is, there are periods during the year when the stream is dry. Indeed, petitioners testified,

> "we were on the Lytle property, it was October of last year and we could see the dam had not been changed (unintelligible) walked in (unintelligible) from the Stoyan pond to the top of (unintelligible) one of them (unintelligible) the Lytle's property and there was no water flowing up it at that time * * *."

Lytle testified during his deposition that there were periods when no water flowed from the Wacker dam to his property. Based on that evidence, ODFW's finding that the stream was intermittent was reasonable, and we conclude that ODFW had substantial evidence to find that the stream did not flow year-round, thus preventing year-round fish migration.

Petitioners' last argument is that ODFW's rules are inconsistent with ORS 509.585(2), which provides, "[e]xcept as otherwise provided by this section * * *, a person owning or operating an artificial obstruction may not construct or maintain any artificial obstruction across any waters of this state that are inhabited, or historically inhabited, by native migratory fish without providing passage for native migratory fish." Petitioners' argument appears to be that the term "passage" makes clear that the statute's purpose is to allow

---

Stoyan for the storage of water and their dams. *See* ORS 537.409 (setting forth the permit application process for qualifying small reservoirs, which includes a review of injury to water rights or adverse impact on existing fishery resources and a public interest review).

fish to pass through artificial obstructions as if the obstruction were not there. At a minimum, petitioners contend, "the plain meaning of the statute requires passage whenever water is flowing past the obstruction through all mechanisms, not just over the top of the dam."

When construing a statute, our goal is to discern legislative intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We look to the text and context of the statute, and if helpful, will consider legislative history. *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009). With that framework in mind, we turn to petitioners' arguments.

Nothing in ORS 509.585 suggests that ODFW is to measure fish passage as if there were no artificial obstruction present. To the contrary, ORS 509.585(5) authorizes ODFW to "negotiate the terms and conditions of fish passage or alternatives to fish passage." The negotiations "may include, but are not limited to, consideration of *equitable factors.*" *Id.* (emphasis added). Such negotiations would be meaningless if the legislature required fish passage to mimic passage as if the dams were not present.

Moreover, the legislature gave authority to the State Fish and Wildlife Director to "develop rules establishing general criteria for determining the adequacy of fish passage and of alternatives to fish passage[,]" including the "feasibility of fish passage and alternatives to fish passage." ORS 509.585(7)(c)(F). None of those criteria suggests that ODFW must promulgate rules that would require fish passage at every dam to be the equivalent of passage without the presence of the dam. Instead, ODFW promulgated rules for the adequacy and feasibility of fish passage through OAR 635-412-0035, as explained above. Because the legislature authorized ODFW to promulgate such rules, and we have determined that ODFW plausibly construed those rules to require fish passage when water is flowing over the top of a channel-spanning fishway, we conclude that petitioners' argument lacks merit. *See* ORS 183.400(4)(b) (courts can invalidate an agency's rule if it exceeds the agency's statutory authority).

Affirmed.