Argued and submitted May 2, 2013, at Oregon State University, Corvallis, decision of Court of Appeals and Final Order on Reconsideration of Oregon Department of Fish and Wildlife reversed, and case remanded to Oregon Department of Fish and Wildlife for further action May 15, 2014

Charles NOBLE
and Deborah Noble,
*Petitioners on Review,*

*v.*

DEPARTMENT OF FISH AND WILDLIFE,
*Respondent on Review,*

*and*

Robert LYTLE
and Galena Stoyan,
*Respondents below.*

(ODFW 700142; CA A140936; SC S060518)

326 P3d 589

Thomas M. Christ, Portland, argued the cause and filed the brief for petitioners on review. With him on the brief was Brian Posewitz, Portland.

Denise G. Fjordbeck, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Christopher G. Winter, Crag Law Center, Portland, and Peter M. K. Frost, Western Environmental Law Center, Eugene, filed the brief for *amici curiae* WaterWatch, Native Fish Society, Oregon Wild, Association of Northwest Steelheaders, and Northwest Environmental Defense Center.

BALDWIN, J.

## BALDWIN, J.

In a judicial review of an order of the Oregon Department of Fish and Wildlife (ODFW), the Court of Appeals rejected petitioners' contention that ODFW's approval of "channel-spanning fishways" associated with two small, privately maintained dams downstream from their property violated state law, including ODFW's own rules, pertaining to fish passage for native migratory fish. Petitioners had argued that the approvals were inconsistent with administrative rules and statutes that, in their view, require that fish passage be provided whenever water is flowing past the dams, whether over the tops of the dams or through outlet pipes required by the state Water Resources Department (WRD). The Court of Appeals rejected that argument, holding that ODFW had plausibly construed its own rules as requiring passage only when water is flowing over the dams, and that the rules, as interpreted, were not inconsistent with the controlling statutes. *Noble v. Dept. of Fish and Wildlife*, 250 Or App 252, 264, 279 P3d 345 (2012). Petitioners sought review and we allowed their petition. We conclude that ODFW's interpretation of the rules is implausible, and we remand to that agency for further action under a correct interpretation.

Petitioners own a parcel of land through which a small, unnamed stream flows. The stream historically supported cutthroat trout and other native migratory fish. Petitioners would like those fish to return to their property, and they have invested a significant amount of money and effort in improving fish habitat in their portion of the stream. Petitioners' objective is for fish to have adequate passage upstream from nearby Beaver Creek, where the fish are present.

When the stream leaves petitioners' property, it flows downstream through properties owned by Wacker, Olson, Lytle, Stoyan, and Hillison, respectively, and thereafter into Beaver Creek. Small artificial dams have been erected on several of the downstream properties, creating ponds. The two dams at issue in this case—those on the Lytle and Stoyan properties—were erected long ago without any water rights or permits. Although petitioners sought to

have the dams removed as illegal, the property owners were able to obtain permits to maintain them from the WRD.[1] The Lytle permit allows the storage of up to one acre-foot of water between November 1 and March 31 of each year. The Stoyan permit allows the storage of up to one acre-foot of water between November 1 and June 30 of each year. Both permits require the dam owners to "pass all live flow outside the storage season described," and prohibit appropriation of water "for any out of reservoir uses, the maintenance of the water level or maintaining a suitable fresh water condition." The permits also require the dam owners to install outlet pipes or provide other means to evacuate water to satisfy prior downstream water rights. Finally, and most significant to the present controversy, the permits require the owners to provide adequate fish passage, as determined to be necessary by ODFW.[2]

When ODFW was contacted about the fish passage conditions, it determined that fish passage was required at

[1] Because the Lytle and Stoyan dams existed before January 1, 1995, store less than 9.2 acre-feet of water, and are less than 10 feet in height, the owners could have notified WRD of their existence on or before January 31, 1997, as provided in ORS 537.405, and obtained more or less automatic recognition that the dams and associated ponds were a beneficial use and exempt from most regulation by WRD. Having failed to do so before the statutory deadline, the owners of the Lytle and Stoyan ponds proceeded under an alternative water right permit process, set out in ORS 537.409, for existing reservoirs with a capacity of less than 9.2 acre-feet or dams less than 10 feet in height. Under ORS 537.409, if an applicant can demonstrate to WRD, after an expedited public interest review process, that the reservoir does not injure any existing water right and does not pose a significant detrimental impact to existing fishery resources, the WRD may grant a water right permit.

[2] The Stoyan permit expresses the condition in the following provision:

"The permittee shall not construct, operate or maintain any dam or artificial obstruction to fish passage in the channel of the subject stream without providing a fishway to ensure adequate upstream and downstream passage for fish. The applicant is hereby directed to contact an Oregon Department of Fish and Wildlife Fish Passage Coordinator before beginning construction of any in-channel obstruction."

The Lytle permit expressed the condition in somewhat different terms:

"The permittee shall install, maintain, and operate fish screening and by-pass devices consistent with current Oregon Department of Fish and Wildlife (ODFW) standards. Fish screening is to prevent fish from entering the proposed diversion while by-pass devices provide adequate upstream and downstream passage for fish. *** Permittee shall obtain written approval from ODFW that the installation of the required screen and bypass devices meets the state's criteria or the permittee shall submit documentation that ODFW has determined screens and/or by-pass devices are not necessary."

each of the two dams because the dams obstructed a stream in which native migratory fish historically had been present. Thereafter, each of the two dam owners developed a proposal for a fishway, installed the fishway, and sought ODFW's official approval.[3]

The Lytle and Stoyan fishways involve alterations to the streambed on the downstream side of the relevant dam, creating a gradual slope from the top of the dam where a vertical drop previously had existed. The Lytle fishway "consists of various sized rocks leading in a ramp configuration up to the top of the Lytle dam, where a channel with a flat bottom and vertical sides *** crosses the top of the Lytle dam to the Lytle pond." The Stoyan fishway "consists of a series of weirs [*i.e.*, v-shaped, step-like structures on the streambed] with pools below each weir, leading in steps from the base of the Stoyan dam up to the top of the Stoyan dam." Unlike the Lytle dam, the Stoyan dam has no engineered "channel" over the dam. ODFW personnel refer to both styles of fishways as "channel-spanning fishways."[4] Such channel-spanning fishways provide fish passage only when water is moving over the top of the associated dam; for all intents and purposes, the top of the dam *is* the fishway.

In November 2006, ODFW issued letters approving the Lytle and Stoyan fishways. Each letter of approval

---

[3] Because WRD had issued the permits for dams that already were in place, the sequence of events here differed somewhat from the sequence that is contemplated by ORS 509.585(4), which provides:

"A person owning or operating an artificial obstruction [that prevents migration of native fish] shall, prior to construction, fundamental change in permit status or abandonment of the artificial obstruction in any waters of this state, obtain a determination from [ODFW] as to whether native migratory fish are or historically have been present in the waters. If the department determines that native migratory fish are or historically have been present in the waters, the person owning or operating the artificial obstruction shall either submit a proposal for fish passage to the department or apply for a waiver pursuant to subsection (7) of this section. *Approval of the proposed fish passage facility or of the alternatives to fish passage must be obtained from [ODFW] prior to construction, permit modification or abandonment of the artificial obstruction.*"

(Emphasis supplied.)

[4] The term "channel-spanning fishway" is not defined in ODFW's rules; neither is it used, as such, in the rules. One rule, OAR 635-412-0035(2)(k)(C), purports to set out specific standards for "stream channel-spanning weirs, roughened channels and hybrid fishways."

described the pertinent fishway, noted that ODFW had determined that it was functioning properly, and stated that the owner was responsible for maintaining it as approved. Petitioners sought reconsideration of ODFW's approvals, and requested and obtained a contested case hearing.

At the hearing, conducted by an administrative law judge from the Office of Administrative Hearings, petitioners argued that ODFW's approvals of the Lytle and Stoyan fishways were improper because the fishways did not provide fish passage at all times when passage is required under the relevant statutes and administrative rules. Petitioners relied in part on ORS 509.585(2), which prohibits "construct[ing] or maintain[ing] any artificial obstruction across any waters of this state that are inhabited, or historically inhabited, by native migratory fish without providing passage" for such fish. Petitioners' primary focus, however, was an administrative rule, OAR 635-412-0035(2)(a), which requires fishways at artificial obstructions that provide fish passage at all flows within the design streamflow range—that is, the entire range of flows within the obstructed stream, excepting the highest and lowest five percent. OAR 635-412-0005(13), (26), (30). Petitioners argued that the rule contemplates that ODFW will measure the flows within a stream, calculate a "design flow range," and ensure that any fishway under consideration provide fish passage whenever the streamflow is within that range—at least during times when ODFW has determined, based on the life cycles of the fish in question, that passage is required. At the hearing, petitioners established, through the testimony of ODFW employees, that ODFW had not calculated and applied the affected stream's "design flow range" or determined when the fish in question required passage before approving the Lytle and Stoyan fishways. Having done so, petitioners argued that the agency had violated its own rule.

ODFW's position at the hearing, articulated in the testimony of the agency's fish passage coordinator, Stahl, was that calculation of the design flow range as contemplated by OAR 635-412-0035(2)(a) was unnecessary for "channel-spanning" fishways like those approved for the Lytle and Stoyan dams. Stahl explained that, by its very nature, a channel spanning fishway uses the entire flow of a stream,

and that determining the "design streamflow range" when fish passage will be required is not necessary for such fishways, because they provide fish passage whenever water is flowing past the dam.

Petitioners argued, however, that OAR 635-412-0035(2)(a) applies to all the water in a stream system, and that ODFW's notion of "streamflow" did not account for water leaving the Lytle and Stoyan ponds through evaporation, seepage, and, most importantly, the outlet pipes that were required under the WRD permits. Petitioners observed, in that regard, that the Lytle and Stoyan permits required the installation of outlet pipes (or some other mechanism) to facilitate the evacuation of water to downstream permit holders with priority, required the passage of all "live" flows outside the storage season, and prohibited appropriation of any additional water outside of the storage season to maintain water levels.

ODFW's contrary view of OAR 635-412-0035(2)(a) was conveyed in the testimony of coordinator Stahl. Stahl acknowledged that, at times, water might not be flowing through the Lytle and Stoyan fishways even when water is flowing from various sources into the subject ponds, at least in part because water is sometimes discharged through the outlet pipes to satisfy the prior rights of downstream users. Stahl testified, however, that any water released downstream through outlet pipes in response to a downstream water right holder's "call" would not be considered by ODFW to be live streamflow. According to Stahl, "[i]f it's not going over the fishway [*i.e.*, over the top of the dam], it's not in the stream." Stahl also suggested that, because OAR 635-412-0035(2)(a) was adopted at a time when channel-spanning fishways were uncommon, the rule reflected concerns more relevant to traditional fish ladder-type fishways, which divert a part of a stream for fish passage during the times that, in ODFW's estimation, the native fish would require passage.

After the hearing, the administrative law judge issued a proposed final order concluding that ODFW had complied with the applicable statutes and rules in approving the Lytle and Stoyan fishways. ODFW affirmed that

conclusion. In its final order, ODFW announced that it had determined that fish passage is required "year-round" for the fishways in question, but only when there is adequate flow to allow migration through the fishways. ODFW explained that channel-spanning fishways like the ones at issue provide fish passage "as a matter of law" whenever sufficient streamflow exists for fish to migrate, and that, as such, ODFW could determine, without precise calculation of the design streamflow range, that the fishways provided fish passage at all flows within the design streamflow range. For purposes of that analysis, ODFW rejected petitioners' interpretation of "streamflow," concluding that "streamflow" is the water that actually moves through the system and over the dams, and does not include water that is stored and then later released through outlet pipes or lost to evaporation or seepage.

Petitioners sought judicial review of ODFW's final order, arguing, among other things, that (1) the rules do not allow ODFW to insert a flow requirement into the concept of "year-round fish passage"; (2) ODFW's construction of the term "streamflow" in OAR 635-412-0035(2)(a) as referring, in the particular context of dams with so-called channel-spanning fishways, only to water actually moving over the dam and through the fishway, is implausible and erroneous; (3) the factual assumptions underpinning ODFW's position that it was unnecessary to calculate and apply the stream's "design streamflow range" for channel-spanning fishways at the dams are not supported by substantial evidence; and (4) if ODFW's construction of the rule is correct, the rule is inconsistent with ORS 509.585(2), which provides that a person may not construct or maintain an artificial obstruction in waters that historically have been inhabited by native migratory fish without providing fish passage.

The Court of Appeals affirmed ODFW's order. It concluded that ODFW's construction of the term "streamflow" in OAR 635-412-0035(2)(a) is plausible. *Noble*, 250 Or App at 261-64. It also held that ODFW had plausibly interpreted the term "year-round fish passage" in a related rule, OAR 635-412-0035(1)(a), as incorporating a "caveat"—that, for channel-spanning fishways, "year-round fish passage" means passage at all times when water is flowing through

the channel-spanning fishway itself. *Id.* at 265-66. Finally, the court rejected petitioner's contention that ODFW's interpretations are inconsistent with ORS 509.585(2), requiring that owners and operators of artificial obstruction provide passage for native migratory fish. *Id.* at 267-68. We allowed petitioners' petition for review to consider whether ODFW correctly interpreted and applied its own rules.

We first set out the relevant statutes and rules to provide the necessary background. The controlling statutes, which are codified at ORS 509.580 to 509.645, were enacted in 2001. ORS 509.585(1) announces the state's policy of providing fish passage for native migratory fish in order to enhance and restore the state's "native salmonid populations." The statute then sets out the basic mandate through which that policy is to be carried out:

> "(2)   Except as otherwise provided by this section or ORS 509.645, a person owning or operating an artificial obstruction may not construct or maintain any artificial obstruction across any waters of this state that are inhabited, or historically inhabited, by native migratory fish without providing passage for native migratory fish."

ORS 509.585(2). The statute further requires ODFW to enforce the fish passage requirement by directly ordering construction of fish passage at existing priority sites, to be determined based on a statewide inventory to be completed by ODFW, ORS 509.585(3), or by exercising approval authority over fish passage proposals that owners and operators must submit before an obstruction is constructed or altered, as provided in ORS 509.585(4).[5] The statute allows the State Fish and Wildlife Commission to waive the fish

---

[5] ORS 509.585(4) provides:

"A person owning or operating an artificial obstruction shall, prior to construction, fundamental change in permit status or abandonment of the artificial obstruction in any waters of this state, obtain a determination from [ODFW] as to whether native migratory fish are or historically have been present in the waters. If the department determines that native migratory fish are or historically have been present in the waters, the person owning or operating the artificial obstruction shall either submit a proposal for fish passage to [ODFW] or apply for a waiver pursuant to subsection (7) of this section. Approval of the proposed fish passage *** must be obtained from [ODFW] prior to construction, permit modification, or abandonment of the artificial obstruction."

passage requirement in favor of any alternative that it determines will provide a net benefit to native migratory fish, and directs ODFW to negotiate with dam operators over the terms and conditions of fish passage. ORS 509.585(5), (6).[6] Finally, the statute directs ODFW to "develop rules establishing general criteria for determining the adequacy of fish passage and of alternatives to fish passage," and specifies that the general criteria shall include, among other things, "the type and quality of habitat," "the species affected," "the status of the native migratory fish stocks," and "the feasibility of fish passage and alternatives to fish passage." ORS 509.585(7)(c).

ODFW has promulgated rules relating to its duties under the above statutes. One notable rule reiterates the basic prohibition expressed in ORS 509.585(2) and appears to express the overriding principle guiding ODFW's fish passage decisions:

"No person shall construct or maintain any artificial obstruction across any waters of this state that are inhabited, or

---

[6] ORS 509.585(5) through (7) provide:

"(5) Consistent with the purpose and goals of the Oregon Plan, [ODFW] shall seek cooperative partnerships to remedy fish passage problems and to ensure that problems are corrected as soon as possible. [ODFW] and the person owning or operating the artificial obstruction are encouraged to negotiate the terms and conditions of fish passage or alternatives to fish passage, including appropriate cost sharing. The negotiations may include, but are not limited to, consideration of equitable factors.

"(6) [ODFW] shall submit a proposed determination of the required fish passage or alternatives to fish passage to the [State Fish and Wildlife Commission] for approval. The determination may be the result of the negotiations described in subsection (5) of this section or, if no agreement was reached in the negotiations, a determination proposed by [ODFW]. If a protest is not filed within the time period specified in ORS 509.645, the proposed determination shall become a final order.

"(7)(a) The [State Fish and Wildlife Commission] shall waive the requirement for fish passage if the commission determines that the alternatives to fish passage proposed by the person owning or operating the artificial obstruction provide a net benefit to native migratory fish.

"(b) Net benefit to native migratory fish is determined under this subsection by comparing the benefit to native migratory fish that would occur if the artificial obstruction had fish passage to the benefit to native migratory fish that would occur using the proposed alternatives to fish passage. Alternatives to fish passage must result in a benefit to fish greater than that provided by the artificial obstruction with fish passage. The net benefit to fish shall be determined based upon conditions that exist at the time of comparison."

were historically inhabited, by native migratory fish without providing passage for native migratory fish."

OAR 635-412-0020(1). For purposes of that rule and related rules, ODFW has defined "fish passage" as

"the ability, by the weakest native migratory fish and life history stages *determined by [ODFW] to require passage at the site*, to move volitionally, with minimal stress, and without physical or physiological injury upstream and downstream of an artificial obstruction."

OAR 635-412-0005(18) (emphasis added). Insofar as OAR 635-412-0020(1) incorporates that definition of the term "fish passage," it is apparent that ODFW intends that its own "determinations" about which fish and which life history stages "require passage at the site" be at the forefront of every decision pertaining to fish passage.

ODFW's specific criteria for fish passage are set out in another rule, OAR 635-412-0035. Consistent with the definition of "fish passage" quoted above, that rule identifies a number of scientific "determinations" that ODFW must make when assessing a dam operator's fish passage plan: whether native migratory fish currently are or historically were present at the site; what life history stages of such fish require fish passage; and what dates of the year and conditions the dam operator must provide passage for fish. OAR 635-412-0035(1)(a)(A) to (C). ODFW is excused from making those determinations when "the owner or operator of an artificial obstruction chooses to provide year-round fish passage for all native migratory fish and life history stages." *Id.*[7]

That rule also sets out various general requirements for fish passage at sites involving a discontinuity between

---

[7] In its entirety, OAR 635-412-0035(1)(a) provides:

"(a) Unless the owner or operator of an artificial obstruction chooses to provide year-round fish passage for all native migratory fish and life history stages, [ODFW] shall determine:

"(A) Native migratory fish currently or historically present at the site which require fish passage;

"(B) Life history stages which require fish passage: and

"(C) Dates of the year and/or conditions when passage shall be provided for the life history stages and native migratory fish."

upstream and downstream surface and streambed elevations. The most important of those requirements, for purposes of our present analysis, is set out in subsection (2)(a): "Fishways shall provide fish passage at all flows within the design streamflow range." OAR 635-412-0035(2)(a). For purposes of that rule and related rules, the "design streamflow range" is "the range of flows within a stream, bracketed by the Low Fish Passage Design Flow and the High Fish Passage Design Flow, for which a fishway shall provide passage." OAR 635-412-0005(13). The "Low Fish Passage Design Flow," in turn, is "the mean daily average stream discharge that is exceeded 95 percent of the time, excluding days with no flow, during the period when [ODFW] determines that native migratory fish require fish passage," while the "High Fish Passage Design Flow" is "the mean daily average stream discharge that is exceeded 5 percent of the time, excluding days with no flow, during the period when [ODFW] determines that native migratory fish require fish passage." OAR 635-412-0005(30), (26). If those definitions are read into OAR 635-412-0035(2)(a), the result is a requirement that "fishways"[8] provide fish passage at all flows "within [the] stream"—except the lowest and highest five percent of average flow—during the period when ODFW "determines that native migratory fish require fish passage."

Finally, a subsection of OAR 635-412-0035(2) that addresses "requirements for specific types of fishways" contains a rule that appears to specifically address channel-spanning fishways:

"Fish passage plans for stream channel-spanning weirs, roughened channels * * * and hybrid fishways * * * which may combine criteria elements of natural streams and/or established fishway types * * * shall clearly demonstrate how water depths, water velocities, water drops, jump pools, structure sizing and fish injury precautions shall provide fish passage."

OAR 635-412-0035(2)(k)(C).

---

[8] A "fishway" means "the set of human-built and/or operated facilities, structures, devices, and measures that together constitute, are critical to the success of, and were created for the sole purpose of providing upstream fish passage at artificial or natural obstructions which create a discontinuity between upstream and downstream water or bed surface elevations." OAR 635-412-0005(20).

With that regulatory framework in mind, we return to the parties' arguments. The parties appear to agree that, insofar as ODFW did not make the determinations described in OAR 635-412-0035(1)(a)(A) to (C) for the Lytle and Stoyan sites, the owners must "provide year-round fish passage for all native migratory fish and life history stages." OAR 635-412-0035(1)(a). The parties differ, however, as to what that "year-round" commitment actually entails. ODFW argues that, in the context of channel-spanning fishways, "year-round fish passage" simply means that the structure is always on and available any time water is flowing over the dam (and thus through the fishway).[9] ODFW therefore argues that, for channel-spanning fishways, "year-round fish passage" incorporates a caveat—*i.e.*, year-round passage as long as water is flowing through the fishway itself.

Petitioners argue that the year-round fish passage alternative cannot be read as incorporating that particular limitation. Rather, petitioners argue, the vagaries of natural streamflow are the subject of the requirement in OAR 635-412-0035(2)(a) that fish passage be provided at all flows in the stream—not the fishway—within the design streamflow range. And although OAR 635-412-0035(2)(a) does limit the flow requirement, through the definitions of Low and High Fish Passage Design Flow, to "the period when [ODFW] determines that native migratory fish require passage," that limitation does not apply when the dam operator has opted to provide year-round passage. Thus, petitioners argue, dam operators who have chosen to provide year-round fish passage are required, under OAR 635-412-0035(2)(a), to provide fish passage throughout the year, whenever the flow in the surrounding stream is within the design streamflow range.

Another area of disagreement between the parties is the proper application of OAR 635-412-0035(2)(a) to "channel-spanning fishways" like those at the Lytle and Stoyan fishways. In the proceedings below, ODFW sometimes appeared to suggest that OAR 635-412-0035(2)(a) simply does not apply to channel-spanning fishways. However,

---

[9] ODFW contrasts that arrangement with "traditional" fish ladders at large dams that use a small part of the total stream flow and only during the times that anadromous fish actually are migrating.

ODFW explained in its final order on reconsideration that the rule does apply to channel-spanning fishways, but that such fishways comply by their very nature and as a matter of law, because they provide passage whenever there is any "streamflow" passing the dams. ODFW reiterates that explanation before this court, adding that, for the particular purposes of the channel-spanning fishways at the subject dams, the design streamflow range is "all water that passes over each of these dams and hence passes into the fishways."

Notably, the parties do not appear to disagree about the logic behind ODFW's explanation as to why it is excused from calculating design streamflow ranges for channel-spanning fishways—that, because such fishways provide fish passage at all times when water is flowing through them, and, because such fishways utilize all of a stream's flow, they necessarily provide passage through the "design streamflow range." What the parties do dispute is the validity of the assumption that underpins that explanation—that channel-spanning fishways utilize all of a stream's flow, as the terms "flow" and "streamflow" are used in OAR 635-412-0035(2)(a). At its core, their dispute is about the meaning of those terms in the context of that rule. ODFW interprets those terms, at least in the context of channel-spanning fishways, as referring to water that flows over a dam. Petitioners contend that "streamflow" should include all water flowing into the reservoir that is associated with a dam or, at the very least, all of the water flowing past the dam, whether over the spillway or through outlet pipes.

We begin our analysis by interpreting the primary administrative rule in controversy, OAR 635-412-0035(2)(a). When interpreting an administrative rule, we seek to divine the intent of the rule's drafters, employing essentially the same framework that we employ when interpreting a statute. *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010). Under that analytical framework, we consider the text of the rule in its regulatory and statutory context. *Id.* When, as here, an agency's interpretation of its own rule is challenged, we accord significant deference to that interpretation. We are required to affirm that interpretation if it is "plausible," that is, if it is not "inconsistent with the wording

of the rule itself, or with the rule's context, or with any other source of law." *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994).

OAR 635-412-0035(2)(a) provides that "fishways shall provide fish passage at all flows within the design streamflow range." As described above, 355 Or at 446, if ODFW's definition of "design streamflow range" is read into the rule, it appears to require fishways to provide passage at all streamflows except the lowest and highest five percent of average flow, during the period when ODFW *"determines that native migratory fish require fish passage."* (Emphasis added.)

In its final order, ODFW focused on the emphasized condition, stating:

"Petitioner's argument [that the department must determine the design streamflow range at the two dam sites] ignores the incorporated elements of the definition of 'design streamflow range' which limit calculation of streamflows to 'the period when [ODFW] determines that native migratory fish require fish passage.' *See* OAR 635-412-0005(26) and (30), incorporated by reference in OAR 635-412-0005(13). [*ODFW*] *finds that fish only require passage at these facilities when there is enough water flowing through the rest of this stream system to permit fish migration.* \* \* \* In other words, when sufficient streamflow exists for fish to migrate, [ODFW] determined fish can move through the fishways, if properly constructed, maintained, and operated. Given this condition, no precise upper and lower flows establish the 'design streamflow' range for a properly designed and constructed stream channel-spanning passage system like [this]."

(Emphasis added). Petitioners argued, however, that ODFW misapplied the condition, treating it as a grant of discretion when, in fact, the referenced "determination" was not within ODFW's discretion and was not relevant to the Stoyan and Lytle dams because the operators of those dams had chosen to provide year-round fish passage.

Although the Court of Appeals reinterpreted ODFW's position in that regard[10] and ODFW has not repeated

---

[10] As discussed below, 355 Or at 450-51, the Court of Appeals interpreted the above-quoted paragraph in ODFW's final order as relying on "a practical assessment of year-found fish passage that is consistent with the nature of a

the same argument in this court, it is an argument that must be addressed. It is clear from context—particularly, the use of the words "determine" and "require"—that the condition that is incorporated by reference into OAR 635-412-0035(2)(a) derives from OAR 635-412-0035(1)(a), and contemplates that ODFW will make its "determination" in accordance with that rule. By the clear terms of the latter rule, such determinations must be based on preliminary, science-based "determinations" about which fish are or historically were present and the life history stages for such fish that require passage. OAR 635-412-0035(1)(a)(A)-(C). Under that rule, if ODFW declines to make any of the preliminary determinations about the historical presence of fish and fish life cycles at a given site, it cannot "determine" when native migratory fish "require" passage at the site (and the applicant for approval presumably is left to provide "year-round fish passage"). Conversely, if the applicant chooses to provide "year-round fish passage for all native migratory fish and life history stages," any "determination" by ODFW as to when fish "require" passage is irrelevant.

ODFW suggests that "year-round fish passage" incorporates a practical element that has no bearing on the "determination" described in OAR 635-412-0035(2)(a)(A)-(C). It argues that, for the particular purposes of channel-spanning fishways, which are designed to operate whenever water is flowing over the dam that they traverse, "year-round fish passage" means fish passage year-round, but only when water is flowing through the channel-spanning fishway. The Court of Appeals endorsed that interpretation as a "practical assessment of year-round fish passage that is consistent with the nature of a channel-spanning fishway":

> "ODFW's interpretation of year-round fish migration at a channel-spanning fishway properly takes into account the difference between channel-spanning fishways, where either there is water or there is not, and the kinds of fishways that divert some water behind the dam for the fishway. Therefore, we conclude that ODFW plausibly construes year-round fish passage in OAR 635-412-0035(1), *as applied*

channel-spanning fishway," rather than "a determination of a time period that would trigger the specific fish-type, life history, and time period determinations required by OAR 635-412-0035(1)(a)(A)-(C)." *Noble*, 250 Or App at 266.

*to a channel-spanning fishway*, to mean passage at all times when water is flowing through the fishway."

250 Or App at 266 (emphasis added).

ODFW explains the theory behind that interpretation in the following way:

"ODFW construes 'year round fish passage' to mean that the structure is such that it is permanent and always 'on' and therefore is available any time that water is present in the stream. The stream is defined for this purpose as the water that flows over the dam and into the fishway. These structures contrast with, for example, the 'traditional' fish ladders at large dams that use a small part of the stream flow and only during the times that anadromous fish are actually migrating. Most fish passage facilities were of that type at the time the rules were drafted."

(Citation omitted.) Thus, ODFW views its proposed interpretation as applying in the context of channel-spanning fishways only, and contends that, for more traditional fishways, "year-round fish passage" would *not* be limited to times when water is present in the fishway itself.

Therein lies the problem. Given that, as ODFW acknowledges, the rule was adopted with traditional diversion-style fishways in mind, the term must have a meaning that is plausible in that context. But it would be circular to interpret "year-round fish passage" to mean that the fishway always is on and available for passage whenever water is present in the fishway, when the fishway under consideration is a traditional one that operates by purposeful, and only occasional, diversion of water into the fishway. It follows that, when ODFW adopted the rule, it clearly intended "year-round fish passage" in the sense that petitioners advocate—fish passage throughout the year, whenever the flow "within the stream" falls within the "design streamflow range."

Of course, ODFW is free to rescind the timing requirement of OAR 635-412-0035(1)(a) for channel-spanning fishways and other fishways designs that it did not have in mind when that rule was adopted. But, insofar as

such a rescission would constitute an amendment of a prior rule, ODFW can only do so through proper rulemaking procedures under the Oregon Administrative Procedures Act (APA), ORS chapter 183. Until it does so, ODFW is bound by the rule and the clear meaning that it conveys—that, in the absence of determinations under OAR 635-412-0035(1)(a)(A) to (C) as to which fish require passage and when, a dam operator must provide fish passage throughout the year at all flows within the design streamflow range. *See Burke v. Children's Services Division*, 288 Or 533, 538, 607 P2d 141 (1980) (administrative rule remains effective statement of existing policy until repealed through proper Oregon APA procedures).

We thus return to the broader question posed in this review with the understanding that, even for channel-spanning fishways, a dam operator's choice to provide "year-round fish passage" under OAR 635-412-0035(1)(a) means that, under OAR 635-412-0035(2)(a), the operator must provide passage throughout the year at all streamflows that are "within the design streamflow range." The meaning of the term "streamflow" in that requirement is at the center of the parties' second major interpretive dispute. As noted above, 355 Or at 451, ODFW contends that, when a channel-spanning fishway is at issue, the "stream" is whatever water flows over the dam and, thus, through the channel-spanning fishway itself. That interpretation is essential to ODFW's theory that channel-spanning fishways comply with OAR 635-412-0035(2)(a) without any numerical calculation of the lowest and highest flows in the affected stream. According to that theory, a channel-spanning fishway necessarily provides passage within the range of streamflows that constitute the "design streamflow range," because it utilizes all of the "stream's" flow. But if "streamflow" refers to water flowing in the stream above the dam associated with the fishway, or includes water passing through outlet pipes at the base of the dam, there is no basis for claiming that the fishway necessarily provides passage at all flows within the design streamflow range, and ODFW's theory loses its logical force.

ODFW has not promulgated a definition of the term "streamflow" for purposes of OAR 635-412-0035(2)(a) and

the surrounding rules. It has, however, provided other pertinent definitions. Its rules define "stream" as "a body of running waters of this state moving over the surface of the land in a channel or bed, including stream types classified as perennial or intermittent and channelized or relocated streams." OAR 635-412-0005(39). The rules also define the term "channel," which is used in the quoted definition of "stream," as a "waterway that periodically or continuously contains waters of this state and has a definite bed and banks that serve to confine the water." OAR 635-412-0005(7).

ODFW contends that, when read in combination, those definitions support its contention that "streamflow" in OAR 635-412-0035(2)(a) refers only to water flowing over the top of a dam and does not include water that initially is stored behind the dam and that later evaporates, or water that is released downstream through outlet pipes. That is so, in ODFW's view, because such water is not "moving" in a "defined bed." Although many questions arise with respect to that explanation,[11] we cannot say that it is wholly implausible on a purely textual level.[12]

---

[11] For example, one might ask why water flowing over a dam is any more confined to a "defined bed" than water flowing under the dam through outlet pipes. Similarly, one might ask why it is necessary to assess whether the water is "moving" and in a "defined bed" at the point of the obstruction, and not upstream or downstream from that point.

[12] Below, ODFW also argued, and the Court of Appeals agreed, that the mere existence of OAR 635-412-0035(2)(k)(C), quoted above at 355 Or at 446, compels the interpretation that "streamflow" excludes water flowing under or through a dam through outlet pipes. The court explained the argument as follows:

"If water flowing through outlet pipes is to be considered in the design streamflow, then, by definition, there could be no channel-spanning weirs or other channel-spanning fishways because *all* of the stream would not be spanning the fishway; rather, some of the streamflow would pass through the outlet pipe. And because WRD requires every dam to have an outlet pipe, OAR 690-020-0025, any rule providing criteria for channel-spanning fishways would be superfluous."

*Noble*, 250 Or App at 263-64 (emphasis in original). We agree with petitioners, however, that treating water traversing a dam through an outlet pipe as part of the "streamflow" would not render OAR 635-412-0035(2)(k)(C) superfluous. In fact, not every dam has, or is even required to have, an outlet pipe. WRD is allowed to waive the pipe requirement if it determines that a pipe is unnecessary or that an alternative for passing flows exists. OAR 690-020-0025. However, while we reject ODFW's argument that OAR 635-412-0035(2)(k) compels the interpretation it advocates for, that conclusion does not resolve the question before us—whether ODFW's interpretation is plausible within the meaning of *Don't Waste Oregon*.

However, the "plausibility" standard that applies to our review here does not require that we consider the targeted text in a vacuum. Under *Don't Waste Oregon,* we also consider whether the agency's interpretation of the rule is inconsistent with the rule's context or with any other source of law. 320 Or at 142; *see also Gafur v. Legacy Good Samaritan Hospital,* 344 Or 525, 537, 185 P3d 446 (2008) (citing *Don't Waste Oregon* rule and holding that Bureau of Labor and Industries interpretation of its own rule was inconsistent with the rule's context and, therefore, was erroneous). Part of the context of OAR 635-412-0035(2)(a) is the basic mandate that animates the entire subset of ODFW rules pertaining to fish passage: "No person shall construct or maintain any artificial obstruction across any waters of this state that are inhabited, or were historically inhabited, by native migratory fish without providing passage for native migratory fish." OAR 635-412-0020(1). As noted above, 355 Or at 444-45, that rule is, in part, a restatement of the statutory prohibition on constructing or maintaining any artificial obstruction on waters historically inhabited by native migratory fish without providing fish passage. ORS 509.585(2). However, ODFW has made the prohibition its own by, among other things, providing a definition of "fish passage" that applies to that and other related rules:

> "'Fish passage' means the ability, *by the weakest native migratory fish and life history stage determined by [ODFW] to require passage at the site,* to move volitionally, with minimal stress, and without physical or physiological injury upstream and downstream of an artificial obstruction."

OAR 635-412-0005(18) (emphasis added). The emphasized wording in that definition clearly refers to the determinations that ODFW must make under OAR 635-412-0035(1)(a)(A) to (C) about the historical presence of and life cycle requirements of native migratory fish. Reading OAR 635-412-0020(1) in the context of OAR 635-412-0005(18) and OAR 635-412-0035(1)(a)(A) to (C), it is apparent that the rule is not flexible and aspirational but, instead, embodies a basic standard: the "fish passage" that dam operators are required to provide under OAR 635-412-0020(1) is passage that meets the biological/life cycle needs of the native

migratory fish that historically were present, as determined by ODFW.

Returning to the issue before us, it would seem that there is no way to give general application to the interpretation of the term "streamflow" in OAR 635-412-0035(2)(a) that ODFW now proposes in a manner that would comport with the standard expressed in OAR 635-412-0020(1). If the "streamflows" at which dam operators must provide passage only take into account the water that flows over the top of the dam, then the necessity for providing fish passage is determined by the planned or existing height of the dam and configuration of outlet pipes, and not by the biological needs of the fish. Taking the most extreme example, a very high dam that passes all of the outflow from the associated reservoir through outlet pipes, and none over the top of the dam, would pass muster under OAR 635-412-0035(2)(a), even if the dam's fishway never provides passage for fish. That is so because the rule requires fish passage only at flows within the design streamflow range, and such a dam would have no "streamflow" or "design streamflow range" within the asserted meaning of those terms. Under ODFW's interpretation, the availability and timing of fish passage always would be dictated by the planned or existing configuration of the dam—and some configurations that provide fish passage at all "streamflows" within the design streamflow range would utterly fail to conform to the basic fish passage requirement set out in OAR 635-412-0020(1).[13]

ODFW might argue that we need not be concerned with how its present interpretation of OAR 635-412-0035(2)(a) would apply to other dam configurations, because it approaches

---

[13] ODFW might be inclined to point out that even petitioners' interpretation of "streamflow" could result in the same inconsistency, based entirely on the very circumstance at which OAR 635-412-0035(2)(a) appears to be directed—natural fluctuations in the streamflow: In the absence of flow from upstream, the fishway could pass muster under OAR 635-412-0035(2)(a), even while the life cycle needs of the relevant fish are not met, as OAR 635-412-0020(1) requires. But, in our view, OAR 635-412-0035(2)(a) is perfectly consistent with OAR 635-412-0020(1): It makes a necessary and inevitable accommodation for the reality of naturally variable streamflows. ODFW's particular interpretation of OAR 635-412-0035(2)(a), on the other hand, makes the arbitrary fact of a dam's design paramount over the needs of fish. That interpretation cannot be squared with the fish-need based standard set out in OAR 635-412-0020(1).

the "design streamflow range" requirement differently at large dams with fish ladders and other more traditional fish passage devices. But our answer to that argument would be the same as our response to ODFW's proposal that the meaning of the term "year-long fish passage" in OAR 635-412-0035(1)(a) varies depending on the type of fishway involved. 355 Or at 451. ODFW is free to make different rules for different categories of dams and fishways, but until it does so, using proper rulemaking procedures under the Oregon APA, it is bound by the rules as promulgated. OAR 635-412-0035(2)(a), as promulgated, applies to all dams and fishways, and the plausibility of the meaning with that ODFW argues for must be assessed accordingly. As we have discussed above, ODFW's interpretation is implausible because, when uniformly applied, it conflicts with the basic requirement expressed in OAR 635-412-0035(1) that dam operators provide passage that meets the biological and life cycle needs of fish.

Before we conclude our analysis, we consider two final arguments raised by ODFW in favor of its interpretation of "streamflow" in the context of OAR 635-412-0035(2)(a). ODFW first suggests that its interpretation is the necessary consequence of its obligation to balance conflicting policies expressed in the controlling fish passage statute, ORS 509.585, and two other statutes pertaining to small dams and ponds like those at issue in this case, ORS 537.405 and ORS 537.409. ODFW describes the former statute as expressing a "preference" that passage be provided for native migratory fish that historically were present at a given site, and the latter two statutes as expressing a policy of "protecting the right of property owners to maintain small ponds existing on their property, even where those ponds are created by dams which potentially interfere with fish passage." ODFW contends that those two policy choices are in some respects inconsistent, and that it had to find some balance between them. ODFW contends that its interpretation of "streamflow" in OAR 635-412-0035(2)(a), in fact, strikes a reasonable balance between the two policies by "assum[ing] the existence of artificial obstructions and provid[ing] for the means by which passage can nonetheless be accomplished when there is water available for that purpose."

But, assuming that ORS 537.405 and ORS 537.409 have any relevance in this context, they do not justify the "balancing" that ODFW purports to accomplish by interpreting "streamflow" in OAR 635-412-0035(2)(a) in the manner that it does. In essence, those two statutes express a policy that small reservoirs, and the dams that create them, are permitted to exist without regard to ordinary water right requirements, as long as they do not injure other water rights or existing fish resources.[14] That policy in no way conflicts with the policy expressed in ORS 509.585 that artificial obstruction must provide passage for native migratory fish that historically have been present.[15] And while ORS 537.405 and ORS 537.409 expressly exempt small reservoirs that are not detrimental to existing fish resources from the ordinary procedures involved in obtaining a water right and from "regulation by the Water Resources Commission and the Water Resources Department," ORS 537.405(1), the statutes do not purport to exempt that category of reservoirs from regulation by ODFW. The policies expressed in

[14] By enacting ORS 537.405, the legislature granted an amnesty for reservoirs in existence before January 1, 1995, that store less than 9.2 acre-feet of water behind a dam that is less than 10 feet in height. ORS 537.405(1). The statute declared such reservoirs to be exempt from the ordinary procedures for obtaining a water right and from regulation by the Water Resources Commission and WRD, as long as the owner provided written notice of the reservoir's existence to WRD before the end of January 1997. *Id.* However, if WRD determined that the reservoir posed a "significant detriment to existing fishery resources" or resulted in injury to an existing water right, it could require the reservoir owner to mitigate those problems. ORS 537.405(4)(a)-(b), (7). By enacting ORS 537.409, the legislature provided an alternative process for small reservoir owners who have failed to take action during the amnesty period provided in ORS 537.405. For any dam and reservoir within the 10 foot, 9.2 acre-feet size limitations, the owner may obtain a right to maintain the reservoir on a lesser showing than ordinarily would be required, unless the reservoir detrimentally affects an existing water right or an existing fishery resource. ORS 537.409(1).

[15] ODFW argues that, insofar as ORS 509.585(7)(c) directs ODFW to establish criteria for determining the "adequacy" of fish passage, the statute merely expresses a policy "preference" for fish passage. We do not agree with ODFW that the "adequacy" directive transforms what evidently is a requirement of fish passage to a mere "preference." *See* ORS 509.585(1) ("[e]xcept as provided in ORS chapter 509, fish passage is required in all waters of this state in which native migratory fish are currently or have historically been present"); ORS 509.585(2) ("a person * * * may not construct or maintain any artificial obstruction * * * without providing passage for native migratory fish"). Rather, that "adequacy" wording authorizes ODFW to determine what, exactly, the fish passage requirement entails. As discussed above, 355 Or at 454-55, ODFW appears to have determined that the requirement means passage that meets the biological/life cycle needs of native migratory fish that historically were present.

ORS 509.585, on the one hand, and ORS 537.405 and ORS 537.409, on the other, are compatible, and each can and should be implemented.[16] There is no basis for ODFW to balance one policy against the other in its rules. And, as discussed, the interpretation of OAR 635-412-0035(2)(a) the ODFW claims is the product of such balancing is implausible in the context of other related rules.

ODFW also contends that its interpretation of OAR 635-412-0035(2)(a) is compelled by the fact that it has no control over the existence and design of the dams for which fish passage must be provided. ODFW notes, in that regard, that the legal authority for permitting dams and issuing and regulating associated water rights has been delegated to WRD. It follows, ODFW argues, that it must accept the existence and configuration of any WRD-permitted dam and base its fish passage requirements on the "streamflow" that actually passes over the dam, rather than the flow that would exist without the dam. For that reason, ODFW argues that it must exclude impounded water that is lost to evaporation and seepage, as well as water passing through the dam's outlet pipes, from its definition of "streamflow." As to the latter point, ODFW observes that outlet pipes are required by WRD as conditions of dam operators' water rights, and that the flows through such pipes are under the control of WRD.[17] It contends that, because ODFW has no authority to regulate when water flows through such outlet pipes, it must consider that water unavailable for fish passage and exclude it from its definition of "streamflow."

While it may be true that WRD's authority over dam configuration and outlet pipes puts many components of a stream's flow beyond ODFW's control, we cannot see how that fact translates into a necessity that those components be

---

[16] ODFW's authority to promulgate rules that implement ORS 537.405 and ORS 537.409 is doubtful, given that those statutes pertain primarily to water appropriation, not fish resources.

[17] ODFW cites ORS 540.340, which provides:

"Whenever it may be necessary for the protection of other water users, the Water Resources Commission shall require every owner or manager of a reservoir or diversion dam, located across or upon the bed of a natural stream, to construct and maintain a suitable outlet in the reservoir or diversion dam which will allow the free passage of the natural flow of the stream."

ignored for purposes of fish passage. In fact, if ODFW were limited in its fish passage efforts to considering aspects of streamflow that are under its control, it would be precluded from imposing a streamflow range requirement altogether: The reality is that ODFW has no control over any aspect of streamflow, yet it still requires dam owners to provide fish passage within the "design streamflow range." We are not persuaded by ODFW's argument that it is required to interpret OAR 635-412-0035(2)(a) in a way that excludes from the meaning of "streamflow" those components of streamflow that are outside its control.[18]

We conclude that ODFW's proffered interpretation of OAR 635-412-0035(2)(a) is implausible because its uniform application would conflict with the basic regulatory requirement at OAR 635-412-0020(1)—that dams must provide passage for native migratory fish at the times and under the conditions that are required by their life cycles. That interpretation was indispensible to ODFW's decisions approving the Lytle and Stoyan fishways. ODFW reasoned that, because channel-spanning fishways like the Lytle and Stoyan fishways utilize all of a stream's "streamflow," as that term is used in OAR 635-412-0035(2)(a), they necessarily provide passage at all streamflows within the design streamflow range, and can be deemed to comply with OAR 635-412-0035(2)(a) without any measurement of flows. Because ODFW's interpretation of OAR 635-412-0035(2)(a) is implausible, its basis for not making an actual determination of the design streamflow range, which the rule requires, is erroneous. We therefore remand to ODFW to apply OAR 635-412-0035(2)(a) to the two fishways—that is, to determine, at each site, the design streamflow range and whether the fishway provides passage at all flows within the design streamflow range during the period that ODFW determines fish require passage.[19] Although the parties have suggested

---

[18] In the absence of any argument to that effect by ODFW, we do not consider whether petitioner's construction of the term "streamflow" in OAR 635-412-0035(2)(a) as including those components conflicts in any way with WRD's statutory authority to regulate the appropriation of water.

[19] We make this disposition pursuant to ORS 183.482(8)(a)(B), which states:

"The court may affirm, reverse or remand the order if the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall

different places in the stream where streamflow might be measured (above the reservoir as opposed to below the dam) we find that the record and the parties' arguments on that issue are insufficiently developed to allow us to resolve that issue. ODFW should decide that issue in the first instance and petitioners may contest ODFW's decision if they disagree.[20]

The decision of the Court of Appeals and the Final Order on Reconsideration of the Oregon Department of Fish and Wildlife are reversed, and the case is remanded to the Oregon Department of Fish and Wildlife for further action.

---

"* * * * *

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

[20] Nothing in this opinion should be interpreted as precluding ODFW from amending its rules to except channel-spanning fishways from OAR 635-412-0035(2)(a) or to otherwise accommodate the policy choices for which it advocates in this review, assuming that any such amendments are consistent with the governing statutes.