Argued and submitted March 12, ballot title certified as modified April 1, 1986

ROGERS et al,
*Petitioners,*

*v.*

ROBERTS,
*Respondent.*

(SC S32591)

Richard T. Ligon, Wilsonville, argued the cause and filed the memorandum for petitioners.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause and filed the answering memorandum for

respondent. With him on the answering memorandum were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

PER CURIAM

Lent and Linde, JJ., concurred and filed opinions.

## PER CURIAM

This is an original proceeding to review a ballot title. A prospective petition to initiate a constitutional amendment was filed with the respondent Secretary of State. The entire text of the proposed amendment is attached as Appendix A.

As a preliminary step, the Attorney General submitted a draft ballot title for the proposed amendment to the Secretary of State, which is attached as Appendix B. ORS 250.065(3). Written comments on the draft ballot title were received by the Secretary of State from two of the petitioners and two members of the public. ORS 250.067(1).[1] The Attorney General considered the written comments and certified to the Secretary of State the following revised ballot title:

"CONSTITUTIONAL AMENDMENT BANNING MOST PROPERTY USE REGULATION, CHANGING ZONING RESPONSIBILITY

"QUESTION:  Shall all property regulation (except by purchase) not essential to health, safety be banned; cities/counties exercise remaining zoning authority?

"EXPLANATION:  Amends constitution. Bans affecting value or rights of private property owner by 'regulation, zoning, ordinance, assessment legal strategem [sic], or police power' by 'any governing body, public entity, organization or person' unless essential to public health or safety. If action would affect value or rights, property must instead be 'taken' by paying market value for most profitable use. Only cities and counties have any remaining zoning authority. State standards and goals become advisory only."

The petitioners, who are also the chief petitioners of the proposed amendment, filed a petition in this court requesting that we review the above revised ballot title certified by the Attorney General. This court's scope of review is defined in ORS 250.085(4):

"(4)  The court shall review the title for substantial compliance with the requirements of ORS 250.035 and 250.039, and shall certify a title meeting this standard to the Secretary of State."

---

[1] The written comments are a part of the record on review in this court. ORS 250.067(4).

ORS 250.035 sets out the form of the ballot title as follows:

"(1)   The ballot title of any measure to be initiated or referred shall consist of:

"(a)   A caption of not more than 10 words which identifies the subject matter of the measure;

"(b)   A question of not more than 20 words which plainly states the purpose of the measure, and is phrased so that an affirmative response to the question corresponds to an affirmative vote on the measure; and

"(c)   A concise and impartial statement of not more than 75 words of the chief purpose of the measure.

"(2)   The ballot title shall not resemble, so far as probably to create confusion, any title previously filed for a measure to be submitted at that election."

The petitioners have not challenged the readability of the Attorney General's revised ballot title under ORS 250.039.[2]

The petitioners contend that because they comprised a part of the measure's drafting committee they, better than anyone else, know the "true intent and purpose" of the measure. The problem, however, is not what the drafters intended, but how to craft a ballot title which in a few words accurately informs the voter of the "subject matter" and "purpose" of the proposed measure and contains a somewhat longer statement setting out the "chief purpose" of the measure.

The petitioners argue that the ballot title certified by the Attorney General is unfair because "it will mislead the reader by focusing on a theme of stripping the government of its ability to govern" when "the purpose of the measure in fact is to enhance individual private property rights and require state leaders to protect these rights by economically compensating the owner if governmental action reduces the property value."

---

[2] ORS 250.039 provides:

"For all measures, the Secretary of State by rule shall designate a test of readability and adopt a standard of minimum readability for a ballot title. The ballot title shall comply with the standard to the fullest extent practicable consistent with the requirements of impartiality, conciseness and accuracy."

The petitioners propose the following ballot title:

CAPTION: MAKES INDIVIDUAL'S RIGHTS IN PROP-
ERTY INVIOLATE: PROTECTED BY THE
STATE.

QUESTION: Shall property owner's rights be inviolate;
state protected; just compensation paid if
property taken for public use; planning local?

EXPLANATION: Makes rights of all persons in their pri-
vate property inviolate and protected by all governing bodies.
Defines when taking occurs; prohibits taking without just and
equitable compensation based on fair market value at highest
and best use. Provides method determining fair market value.
Costs of defending right borne by the takor [sic]. Requires
bond for value and expenses prior to taking. Authority for
planning restored to cities and counties; subject to this
amendment."

As an alternative, the petitioners support the Attor-
ney General's first draft, which is attached as Appendix B.

The Attorney General argues that the certified ballot
title submitted to the Secretary of State meets the substantial
compliance test required by ORS 250.085(4). The substantial
compliance test as to ballot titles was adopted by the Oregon
Legislature by 1985 Oregon Laws, chapter 447, effective
September 20, 1985.[3]

■     Although this court has many times[4] used the term
"substantial compliance," we have never attempted to define
it. Courts from other jurisdictions have attempted to define
"substantial compliance" as it pertains to statutes. By the
nature of the beast it can be defined in only general language.
We agree with the broad definition used by the Kansas
Supreme Court: "Substantial compliance requires compliance
in respect to the essential matters necessary to assure every
reasonable objective of the statute." *Sabatini v. Jayhawk
Construction Co., Inc.*, 214 Kan 408, 411, 520 P2d 1230 (1974);

---

[3] Senate Bill 882, sponsored by the Secretary of State, became 1985 Oregon Laws,
chapter 447. Nothing in the available legislative history gives the reason for the
amendment to ORS 250.085(4) adopting the "substantial compliance" test.

[4] *State v. Pottle*, 296 Or 274, 677 P2d 1 (1984); *Modoc Lumber Co. v. EBI
Companies*, 295 Or 598, 668 P2d 1225 (1983); *Webb v. Highway Division*, 293 Or 645,
652 P2d 783 (1982); *Brown v. Portland School Dist. #1*, 291 Or 77, 628 P2d 1183
(1981); *Dowers Farms v. Lake County*, 288 Or 669, 607 P2d 1361 (1980).

*see also City of Lenexa v. City of Olathe,* 233 Kan 159, 164, 660 P2d 1368 (1983); *Houman v. Mayor and Council of Borough of Pompton Lakes,* 155 NJ Super 129, 169, 382 A2d 413 (1977). We also agree with the Washington Court of Appeals when it said: "What constitutes substantial compliance with a statute is a matter depending on the facts of each particular case." *In re Santore,* 28 Wash App 319, 327, 623 P2d 702 (1981).

■ The revised ballot title submitted by the Attorney General does not substantially comply with the requirements of ORS 250.035. It does not correctly identify the subject matter or accurately state the chief purpose of the proposed measure. Both are essential matters which must be correctly described to assure the objective of the statute.

The major problem with the revised ballot title which the Attorney General certified is the use of the terms "banning," "banned" and "bans." One dictionary definition of "ban," in the context that it is used in the ballot title, is "prohibit by legal means." Webster's Third New International Dictionary 169 (1971).

■ The use of the term "banning" in the caption of the revised ballot title does not accurately identify the subject matter of the proposed measure. The relevant part reads, "BANNING MOST PROPERTY USE REGULATION." The measure does not ban or prohibit any property use regulation. What it in effect prohibits is the taking by the government of the value or rights of the owner of private property by zoning or regulation which is not essential to public health and safety *without* the payment of just compensation. The government can continue to zone or regulate a private owner's property for purposes not essential to public health and safety, *but* must pay just compensation if the value of the property is reduced. The result of this measure *may be* that the government will find zoning and regulation too expensive and cease the practice. That is speculation. The ballot title should not include speculation as to the result or consequences of the measure. *Christenson v. Paulus,* 297 Or 78, 80, 682 P2d 266 (1984). The use of the term "banned" in the question and use of "bans" in the explanation of the revised ballot title are not an accurate description of the proposed measure for the same reasons.

The chief purpose of the measure proposing the

constitutional amendment is set out in sections (2), (3), (4) and (8). See Appendix A. A paraphrase of the chief purpose is as follows:

Taking any of the value or rights of private property by regulation, zoning, ordinance, assessment legal stratagem, or police power for any purpose which is not essential to public health and safety is prohibited without just and equitable compensation based on the current fair market value of the property taken at its highest and best use at the time of taking. A taking occurs when any governing body, public entity, organization or person appreciably diminishes, damages, deprives or expropriates the rights of any owner of private property. The taking of real property shall be in fee simple. The governing body of each city and county shall have authority over all matters pertaining to planning and zoning, and state standards and goals shall be advisory.

An example demonstrates the chief purpose. If the government by passing zoning regulation reduces the value of a piece of land by 25 percent, then it is required to pay the owner the full fair market value for the fee simple title to the land.

The above paraphrase contains 124 words. The problem is to condense it to 75 words for a statement of purpose. We are also required to find 10 words which correctly identify the subject matter and 20 words for a proper question.

We certify the following ballot title:

CONSTITUTIONAL AMENDMENT REQUIRING PAYMENT FOR PROPERTY WHEN REGULATION REDUCES VALUE

QUESTION: If government regulation, except for health and safety, "appreciably" reduces property value shall owner be compensated for entire property?

STATEMENT OF PURPOSE: Amends Constitution. Taking value or rights of owner of private property by regulation, zoning, ordinance, or police power for purpose not essential to public health and safety is prohibited without just compensation for market value of property at its highest and best use. Real property taken in fee simple. Taking occurs when governing body appreciably reduces rights of private property owner. Cities and counties are responsible for planning and zoning. State standards are only advisory.

# APPENDIX A

# CONSTITUTIONAL AMENDMENT

Be It Enacted by the People of the State of Oregon:

The Constitution of the State of Oregon is amended by adding Section 41 to Article 1 as follows:

"Section 41. Individual's rights in private property inviolate; and protected by the state.

"(1)     The right of an individual to acquire and own private property and use it for any purpose; except for those uses that endanger the public health and safety; enjoy the fruits of its production; dispose or sell it at its fair market value based on the highest and best use shall be inviolate, the rights inalienable and shall be protected by the state, and the political subdivisions thereof.

"(2)     Taking any of the value or rights of the owner of private property by regulation, zoning, ordinance, assessment legal strategem [sic], or police power for any purpose which is not essential to public health and safety is prohibited without just and equitable compensation, assessed and arranged prior to the taking, and such taking of real property shall be in fee simple.

"(3)     A taking occurs when: Any action by any governing body, public entity, organization or person the affect of which is, or will be to appreciably diminish, damage, deprive or expropriate the rights of any owner of private property, including the right to leave property equally to heirs general.

"(4)     Just and equitable compensation shall be based on the current fair market value of the property being taken at its highest and best use at the time of the taking, and it must be declared a taking and paid for as title passes.

"(5)     Just and equitable compensation shall be determined by negotiation, arbitration, or jury trial in the Circuit Court with jurisdiction wherein the major portion of the property is located.

"(6)     All costs incurred by the owner in determining the fair market value of any property being taken shall be borne by the initiator of the taking action.

"(7)     The initiator of a taking, as plaintiff, shall post a bond adequate to cover the fair market value, as determined in Subsections (4) and (5), of the subject property and all the expenses that might be incurred by the owner in protecting his rights and interest in the property. Said bond to be

deposited in an escrow account with a legally licensed escrow agent of the state of Oregon.

"(8)   Subject to the provisions of this section the governing body of each city and county shall have authority over all matters pertaining to planning and zoning, and state standards and goals shall be advisory.

"(9)   Nothing in this section is intended to prevent the owner of a property subject to a taking from bringing suit or action for relief and just and equitable compensation, plus all reasonable expenses that might be incurred.

· "(10)   The legislature shall enact legislation to carry out the provisions of this amendment. This amendment shall supersede all constitutional provisions in conflict herewith.

"(11)   If any section portion, clause or phrase of this amendment is for any reason held to be invalid or unconstitutional the remaining sections portions, clauses and phrases shall not be affected, and shall remain in full force and effect.

"(12)   Definitions: The following words, used in this amendment (sic) shall have the following meaning as applied to this amendment unless the text otherwise requires:

"(1)   INVIOLATE: Individual rights in private property inviolate or incapable of being broken, taken or destroyed, rights indestructible secure from violation, infringement, assault or trespass.

"(2)   INALIENABLE; Rights to title cannot be usurped or transferred by another, incapable of being surrendered, transferred or taken, annulled, voided, undone, forfeited or taken.

"(3)   FEE SIMPLE: An estate in real property which the owner has the greatest power over title possible to have under our system of law. He may dispose of it by sale, or trade or will, as he chooses. It is the best title one can have, complete ownership."

## APPENDIX B

CONSTITUTIONAL AMENDMENT PROTECTS PROPERTY RIGHTS TAKING PROPERTY PROHIBITED WITHOUT COMPENSATION.

QUESTION: Shall constitution require "just compensation" if government action reduces property value, with cities, counties responsible for land use planning, zoning.

EXPLANATION: Amends constitution. Prohibits taking any value or rights of private property owner by zoning, ordinance, police power or assessment for purposes not essential to public health and safety without "just compensation" based on fair market value at highest and best use. Such taking of real property must be in fee simple. Taker bears costs of determining fair market value. Cities an counties are responsible for planning and zoning. State standards and goals are advisory only.

**LENT, J.,** concurring

I concur in the title certified by the court pursuant to ORS 250.085(4) only because it is virtually impossible to do any better, given the text of the measure proposed by the petitioners.[1]

The electorate and the courts are used to dealing with measures that may contain some drafting flaws which produce questions as to what is intended by the sponsors. When flaws are minor and the chief purpose is easily ascertained, common sense often comes to the rescue so as to permit one to compose a ballot title that will meet the statutory requirements and ignore the flaws. In the case of this proposed measure, the flaws are not minor, and the chief purpose is not easily ascertained.

The Attorney General, pursuant to ORS 250.065(3), provided a draft ballot title. ORS 250.067 provides for comments on the draft title. One of the chief petitioners, Rogers, commented that he found the title "acceptable as prepared." Another, Pfaff, found the draft title "entirely appropriate," "fairly stated" and clear "with regard to the meaning and intent of this petition."

Another person, Neuburger, who claimed in his written comment to be a "member of the drafting committee" of the measure, expressed his extreme dissatisfaction with the draft title. He stated that the committee recognized that most of the abuses of citizens' rights concerned real property but that the committee was concerned with "*all* aspects of citizens' property." He continued that the measure was intended to cover

"liberty of contract, right to spend one's salary on what one wishes, riparian rights, rights against seizure of property due to license revocation, rights to carry on an occupation to earn one's living."

He complained that the draft title did not reflect the omnibus

---

[1]As I shall point out later, one of the drafters of this measure does not agree that it speaks only to reduction in value. Maybe he is right.

nature that the drafters intended. He further contended that the draft title implied that there would be compensation only for "reductions" in property value. Said he:

"This is not true. One of the most flagrant abuses of citizens' rights we considered was the recent increase in assessed valuation of certain Clackamas county properties where property was *upzoned,* i.e., *increased* in value. * * * A protection against this type of abuse is incorporated in subsection (2) of the amendment that prohibits a taking by 'assessment' as well as zoning; a taking relating, here, to an action by a public body that can be construed to be a deprivation of right through inverse expropriation. Thus, a person's right in property can be damaged by 'upzoning.' This aspect is *not* addressed in the 'QUESTION.'"

Mr. Neuburger is not a petitioner before this court, but his comments are a part of the record on review by this court under ORS 250.067(4). I note them because they make it abundantly clear that the text chosen by the drafters of the measure seem to mean different things even among themselves.

The petitioners eschew any desire to hinder the power of governing bodies to regulate for the public health and safety. The meaning and content of that term is not completely free from doubt, and it may well mean something different to the sponsors of the measure than it would to others, but I shall assume that the meaning could be eventually ascertained on a case-by-case basis. For the purpose of this opinion I shall take regulation by any means to be regulation for other than the protection of health and safety.

Subsection (1) of the proposed measure provides:

"The right of an individual to acquire and own private property and use it for any purpose; except for those uses that endanger the public health and safety; enjoy the fruits of its production; dispose or sell it at its fair market value based on the highest and best use shall be inviolate, the rights inalienable and shall be protected by the state, and the political subdivisions thereof."

Although the want of orderly arrangement of these words raises many interesting questions as to purpose of the subsection, I shall for the moment confine my remarks to the declaration that some thing or things are "inviolate" and

"inalienable." I find that these terms are defined in subsection (12):

"(12) Definitions: The following words, used in this amendment (sic) [sic] shall have the following meaning as applied to this amendment unless the text otherwise requires:[2]

"1. INVIOLATE: Individual rights in private property inviolate or incapable of being broken, taken or destroyed, rights indestructible secure from violation, infringement, assault or trespass.

"2. INALIENABLE: Rights to title cannot be usurped or transferred by another, incapable of being surrendered, transferred or taken, annulled, voided, undone, forfeited or taken."

As is readily seen, there is a certain circuity or tautology in defining "inviolate" as "inviolate," but I leave that for some other time. What is important is that a right which is inviolate is defined as one that cannot be taken; nevertheless, subsections (2) and (3) of the proposed measure are largely concerned with the taking of those very things.

Subsection (1) provides that certain rights in property are "inalienable," and subsection (12) states that this term means that rights to title are incapable of being surrendered or transferred. Using the definition provided by the sponsors of this measure causes subsection (1) to say that the right or power to sell or dispose of property is "inalienable" but in the same breath that the right of title is incapable of being surrendered or transferred. In the words of either Laurel or Hardy, "This is a fine kettle of fish you've got me into."

Subsection (2) provides:

"Taking any of the value or rights of the owner of private property by regulation, zoning, ordinance, assessment legal strategem [sic], or police power for any purpose which is not essential to public health and safety is prohibited without just

---

[2]The apparently purposeless insertion of "(sic)" suggests the influence of a "teacher" of law not lately in the public eye as much as in former times. *See Marguerite E. Wright Trust v. Dept. of Rev.*, 297 Or 533, 538-545, 685 P2d 418 (1984) (Lent, J., concurring). It is hard to imagine a reason why a "(sic)," which ordinarily indicates a mistake in spelling, should be inserted by the very person who drafts the text; but if the drafter wished to employ a "(sic)" somewhere, he could have done so after the phrase "the affect" in subsection (3).

and equitable compensation, assessed and arranged prior to the taking, and such taking of real property shall be in fee simple."[3]

We find here that if government takes any of the value or rights of the owner of private property by the enumerated means, just compensation must be paid therefor, and if real property is taken, the fee simple must be taken. Subsection (3) teaches the meaning of "taking."

"A taking occurs when: Any action by any governing body, public entity, organization or person the affect [sic] of which is, or will be to appreciably diminish, damage, deprive or expropriate the rights of any owner of private property, including the right to leave property equally to heirs general."

Taken together, the subsections are capable of meaning that if government by any of the enumerated means appreciably diminishes the rights of an owner of real property, that constitutes a taking, obligating the owner to sell, and the taxpayers to buy, the real property for just compensation. I sincerely hope that is not the case. Should my city pass an ordinance banning the planting of deciduous trees on single-family residence lots, thereby appreciably diminishing my present right to plant such trees around my home, I do not want thereby to be forced to sell my home to the city (to be paid for by the taxpayers) just because the constitution states that the taking "shall" be in fee simple.

Another thought occurs to me. Suppose the government by one of the enumerated means appreciably diminishes the rights of an owner of a life estate in real property. The measure says that the taking "shall" be in fee simple, one meaning of which, given in subsection (12), is "complete ownership." Does this mean that the remainderman must sell (and the taxpayers buy) whether the remainderman wants to do so or not? One might say that common sense tells us that it was never intended that the owner must sell and the taxpayer

---

[3]The inclusion of the word "assessment" is what caused Mr. Neuburger's concern. I am not clear in my mind just what he believes this language to accomplish. Maybe he construes it to mean that if the assessor raises the appraised value of the property, the taxpayers will have to buy, and the owner will have to sell, the property at the appraised value.

must buy, but subsection (4) makes it abundantly clear that where there is a taking, "title" is to pass.[4]

Without even addressing the ambiguities and internal inconsistencies contained in the rest of the subsections, I believe that I have demonstrated the difficulty in discerning the "purpose" of this measure and expressing it in the form commanded by the statute. I would finally, however, address the fact that actions by regulatory agencies, such as the Public Utilities Commissioner, Banking Section, Real Estate Commissioner, Board of Forestry, etc., may by "regulation" (or even "legal stratagem") appreciably diminish the rights of the owner of property, thereby constituting a taking that results in title passing in fee simple to the government and obligating the taxpayers to pay for the acquisition. I do not suppose that any regulatory body would do so, but I suppose that it is possible that the Board of Forestry, with an eye on a nice piece of timberland, might adopt a regulation that had the effect of appreciably diminishing the rights of the owner and thereby force a sale to the Board, or the state, regardless of the owner's desires.

I am fully cognizant that this court has often said that the effect of a measure need not be addressed in the ballot title, but when a measure is ambiguous in its effect, it is difficult to discern and express its purpose. The sponsors' stated purpose cannot override what their chosen words would accomplish.

**LINDE, J.,** concurring.

The law governing ballot titles for initiative petitions imposes on the Attorney General, and too often on this court, the thankless task to compress into a few words what anyone with a blunt pencil and a cause wants Oregon's voters to put into the constitution or laws. The present case perhaps can gain some measure of sympathy for those who struggle with this task, usually to someone's dissatisfaction.

ORS 250.035 prescribes that the different parts of the

---

[4]Subsection (4) provides:

"Just and equitable compensation shall be based on the current fair market value of the property being taken at its highest and best use at the time of the taking, and it must be declared a taking and paid for as title passes."

ballot title shall state, respectively, the "subject matter," the "purpose," and the "chief purpose" of a proposed measure.[1] To do this, the Attorney General (and this court) must find a way to summarize the measure, but without speculating about its effects or about the meaning of ambiguous provisions that may become the subject of legal disputes. *Kegg v. Paulus,* 282 Or 47, 50, 576 P2d 1255, 1256 (1978). That can be quite a challenge, as the present proposal for a new section of the Oregon Constitution illustrates.

1. The measure purports to protect private property rights against government regulation not essential to public health and safety. Does the measure apply to personal property as well as real property?

Subsection (2), in a single sentence, uses first the phrase "private property" and later the phrases "taking of real property" and "fee simple" (a real property term rather exuberantly defined in subsection (12)). Subsection (3) again refers to the rights of "any owner of private property." Subsection (4) says that a taking must be declared "and paid for as title passes." Subsequent subsections refer only to owners of "property" without limitation to real property.

In oral argument, counsel for petitioners expressed a belief that the measure probably applies to property of any kind. The question has considerable importance, since the effect of government regulation for purposes other than health and safety, particularly rate regulation of public utilities, minimum wage or maximum hour standards, antidiscrimination laws, and the like have in the past been attacked for reducing the profitability and therefore the value of business property other than real property.

2. Does the measure apply only to "individual"

---

[1]ORS 250.035 (1) provides in pertinent part:

"(1) The ballot title of any measure to be initiated or referred shall consist of:

"(a) A caption of not more than 10 words which identifies the subject matter of the measure;

"(b) A question of not more than 20 words which plainly states the purpose of the measure, and is phrased so that an affirmative response to the question corresponds to an affirmative vote on the measure; and

"(c) A concise and impartial statement of not more than 75 words of the chief purpose of the measure."

rights, or does it include corporate property? The proposed Section 41, in its title and in subsection (1), refers to the "individual's" rights in private property. The subsequent subsections refer to the "owner" of private property, except for a definition in subsection (12), which once again refers to "individual rights in private property."

3. If enacted, the measure would "supersede all constitutional provisions in conflict herewith." Section 41(10). Under subsection (2), regulations would be a "taking" if their purpose is "not essential to public health and safety." Aside from the predictable dispute how far governments may stretch the link of a regulation to health and safety (and whether "public" differs from "individual" health and safety), does the proposal intend to supersede such protection as the existing "taking" clause, Article I, Section 18, may offer landowners when an undoubted health and safety law leaves them with no economic use for their property?

I mention these questions not to express any view of the answers or of the sponsor's goals but to show the problem facing the drafter of a "plain," "concise," and "impartial" ballot title. Sponsors, of course, want the title to present their fundamental ideas in the best light, in this case by stressing such terms as "inviolate" individual rights in property, without too much attention to just what the measure proposes to do.[2] But the Attorney General's assistants deserve better than to have their efforts attacked on the ground that the Attorney some years earlier contributed to an organization that opposes the sponsors' proposal.[3]

The Court has done as well with the revised ballot title for this measure as it reasonably can be expected to do, and I concur in its decision.

Lent, J., joins in this opinion.

---

[2]*Compare Wells v. Paulus,* 296 Or 338, 675 P2d 482 (1984), reviewing a ballot title for a measure that proposed numerous changes in criminal procedure which its sponsors wished to characterize as protecting "victims' rights."

[3]Petitioners criticize changes made in the first ballot draft of the title after receiving comments from 1000 Friends of Oregon (under the procedure of ORS 250.067) as "grossly unfair" because the Attorney General was a "sustaining member" contributing $100 a year to that organization during 1975-79, when he was a member of the Oregon House of Representatives.