No. 1014    November 26, 2025    213

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

COLUMBIA RIVERKEEPER,
Native Fish Society, Northwest Environmental Defense
Center, Oregon Wild, Pacific Coast Federation of
Fishermen's Associations and Institute for Fisheries
Resources, The Conservation Angler, Nez Perce Tribe, a
federally recognized Indian tribe, and Confederated Tribes
of the Umatilla Indian Reservation,
*Petitioners,*

*v.*

OREGON FISH AND WILDLIFE COMMISSION,
*Respondent.*

A182213 (Control), A182217

Argued and submitted September 11, 2024.

Maura C. Fahey argued the cause for petitioners Columbia Riverkeeper, Native Fish Society, Northwest Environmental Defense Center, Oregon Wild, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and The Conservation Angler. Geoffrey M. Whiting argued the cause for petitioner Nez Perce Tribe. Brent H. Hall argued the cause for petitioner Confederated Tribes of the Umatilla Indian Reservation. Also on the briefs were Kelly Chang and Crag Law Center; David J. Cummings and Nez Perce Tribe, Idaho; Hall Law, PLCC, Washington; Joseph Pitt, Andrea Brown, and Confederated Tribes of the Umatilla Indian Reservation.

Kate Morrow, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Hellman, Presiding Judge, Lagesen, Chief Judge, and O'Connor, Judge.*

HELLMAN, P. J.

_____
* O'Connor, J. *vice* Mooney, S.J.

Amendments to OAR 635-412-0005(20), OAR 635-412-0005(51), and OAR 635-412-0035(6), effective January 1, 2023, held invalid.

**HELLMAN, P. J.**

Petitioners bring a facial challenge under ORS 183.400 to the January 1, 2023, amendments to Oregon Department of Fish and Wildlife (ODFW) administrative rules adopted by the Oregon Fish and Wildlife Commission (the commission) regarding Oregon's Fish Passage Program.[1] The challenged rule amendments are amendments to the definition of "fish passage," OAR 635-412-0005(20), and "volitionally," OAR 635-412-0005(51),[2] and amendments to the requirements for fish passage at traps, OAR 635-412-0035(6). In one assignment of error, petitioners argue that the amendments to those rules were adopted without compliance with applicable rulemaking procedures, in violation of ORS 183.335. We conclude that the commission did not substantially comply with the notice requirements for amendment of administrative rules under the Oregon Administrative Procedures Act (APA). As a result, the January 1, 2023, amendments to OAR 635-412-0005(20), OAR 635-412-0005(51), and OAR 635-412-0035(6) are invalid.

## I.  BACKGROUND

Petitioners include nonprofits dedicated to researching, protecting, and restoring Oregon waterways and the fish connected to them; commercial fishing associations; the Nez Perce Tribe; and the Confederated Tribes of the Umatilla Indian Reservation. Petitioners all have interests in the health and welfare of native migratory fish, which are the subject of the rules at issue in this case, which we refer to as the "Fish Passage Rules." The Fish Passage Rules exist to protect the ability of native migratory fish to pass through human-made barriers to their migration, such as dams and roads, absent a waiver or exemption. *See* OAR 635-412-0001 (stating that the purpose of the rules is to "provide for upstream and downstream passage of native

---

[1] The commission is the rulemaking body; ODFW is the rule implementing body. The commission is the named respondent in this case. In this opinion, we refer to the commission and ODFW collectively as "the agency."

[2] The subsection numbers of the definitions in OAR 635-412-0005 changed between the 2006 rules and the adopted rules. Those changes do not affect our analysis, so we proceed using the subsection numbers in the adopted 2023 rules, unless otherwise indicated.

migratory fish at artificial obstructions," such as dams, and "to promote fish passage while recognizing cooperation and collaboration between public and private entities are necessary to accomplish the policy goal of providing fish passage for native migratory fish and to achieve the enhancement and restoration of Oregon's native migratory fish populations"). Fish passage policy was originally adopted into law in 2001, codified at ORS 509.580 through 509.910, and in 2006, the commission adopted the administrative rule scheme at issue here. The 2006 rules required that fish be able to pass through obstructions volitionally, *i.e.*, on their own, as opposed to being trapped or moved via human intervention, absent a waiver or exemption. The commission initiated a Fish Passage Rule revision process in 2021, which produced the rule amendments at issue in this case.

That rule revision process, which occurred over the course of two years, consisted of more than 20 public stakeholder meetings; six task force public meetings;[3] two public comment solicitation periods, one in 2021 and another between August and September 2022, resulting in over 400 public comments; and other meetings with interested individuals and organizations. During the meetings, participants discussed public and internal concerns and confusion about the current rules and debated potential changes to the rules, while considering the public's input. On October 21, 2022, the agency published its notice of proposed rulemaking with the caption "Fish Passage Rule Amendments." The notice also included the statutorily required summary of need for the rules: "These rules are needed to implement [Oregon's] fish passage policy that requires fish passage throughout the state for native migratory fish. These revised rules will provide clarity on existing standards, establish new standards, and ensure alignment with the ODFW Climate and Ocean Change Policy." *See* ORS 183.335(2)(b)(C).

Attached to the notice was a copy of the rules with proposed amendments. Notably, the copy of the rules did not include the amendments at issue in this case. The notice included a "Rule Summary" at the beginning of each rule

---

[3] The fish passage task force is a task force that the legislature created in 2001, and it reports semi-annually to the legislature. ORS 509.590. A rules revision subcommittee was convened to work on the rule revision process.

section, all of which stated that "[t]hese rule amendments implement the State of Oregon's fish passage policy by establishing new standards and clarifying existing regulations." The proposed amendment to OAR 635-412-0005(20), the definition of "fish passage," consisted of adding the following underscored material:

> "'Fish passage' means the ability, by the weakest native migratory fish and life history stages determined by the Department to require passage at the site, to move volitionally, with minimal stress, <u>minimal delay</u>, and without physical or physiological injury upstream and downstream of an artificial obstruction."

There was no proposed amendment to OAR 635-412-0005(51), the definition of "volitionally," which read:

> "'Volitionally' means with minimal delay and without being trapped, transferred, or handled by any person, unless specifically allowed under OAR 635-412-0035(6)."

As relevant, OAR 635-412-0035(6) was amended, with strikethrough for deletions and additions underscored, to read: "Requirements for fish ~~passage~~ <u>collection and transport</u> at traps ~~ar~~<u>include</u>[.]" It did not include the ultimately adopted OAR 635-412-0035(6)(g).

The notice requested public comment and stated that the last day to offer it was December 16, 2022. A meeting was scheduled for December 16, at which the commission would vote on the proposed amendments.

At some point before the December 16 meeting, a packet with information and documents related to the meeting was sent out.[4] That packet included an agenda item summary, a copy of the October notice and attached proposed rules, information about the rules revision subcommittee process, a summary of the public comments received before September 30, 2022, and supplemental correspondence from the public received after October 1. The packet also included an updated set of proposed revisions, many of which had

---

[4] It is unclear from the record exactly when the packet was sent and who it was sent to, but the final signature approving the packet materials was dated November 30, 2022. Presumably, the earliest it was sent was November 30. At oral argument, the agency represented that it was sent on December 4, two weeks before the meeting.

not been included in the proposed amendments noticed in October.

First, unlike the two-word addition in the October notice, the version of OAR 635-412-0005(20) disseminated in the meeting packet read:

> "'Fish passage' means the ability, by the weakest native migratory fish and life history stages determined by the Department to require passage at the site, to move either volitionally or by trap collection and transport if consistent with requirements of OAR 635-412-0035(6), with minimal stress, minimal delay, and without physical or physiological injury upstream and downstream of an artificial obstruction."

Next, OAR 635-412-0005(51) was amended to read: "'Volitionally' means with minimal delay and without being trapped, transferred, or handled by any person[,unless specifically allowed under OAR 635-412-0035(6)]." In addition, OAR 635-412-0035(6) was amended to read: "Requirements for fish passage by trap collection and transport [at traps are]include[.]" Finally, OAR 635-412-0035(6)(g) was added and provided:

> "Traps shall be utilized where the feasibility of other fish passage structures or other site-specific considerations warrant use of trap collection and transport, or otherwise, the Department determines, using its professional judgment, trap collection and transport will result in an effective means of ensuring access to habitat above or below the artificial obstruction by native migratory species."

It is unclear from the record exactly when, why, and by whom the additional revisions were made. The revisions were made without additional public notice and were adopted at the December 16, 2022, meeting. Those amendments became effective on January 1, 2023.

On review, petitioners challenge the 2023 amendments to the definition of "fish passage," OAR 635-412-0005(20), and "volitionally," OAR 635-412-0005(51), and to the requirements for fish passage at traps, OAR 635-412-0035(6). Petitioners argue that the revisions made several substantive changes, including: (1) changing the core definition of "fish

passage" to add "trap collection and transport" as an alternative to volitional fish passage; (2) changing the process of trapping and transporting fish from being a type of artificial obstruction to a form of fish passage; and (3) providing ODFW entirely new discretionary authority to allow trap and transport in lieu of volitional fish passage dependent only upon its "professional judgment." Petitioners argue that the changes made after the noticed rules were so significant that they required the agency to issue a new notice and allow for public comment on the additional revisions. Petitioners further assert that the October notice, including its statement of need, was insufficient to put the public on notice about the last-minute revisions; specifically, that the revisions "could not have reasonably been understood to be included within the scope of the notice." According to petitioners, the revised rules are invalid because the agency did not substantially comply with the notice requirements in ORS 183.335.

The agency argues in response that the October notice was sufficient for the challenged revisions because the revisions were within the subject matter of the notice. Regardless, the agency asserts, the challenged revisions were simply clarifications of the existing rules.

## II.   STANDARD OF REVIEW

We begin with the standards of review upon which the parties agree before discussing the dispute over what is required to "substantially comply" with the notice provisions of ORS 183.335, as required by ORS 183.335(11)(a).

### A.   *General Standards of Review*

ORS 183.400 empowers us to determine the validity of state agency rules.[5] We may declare a rule invalid only

---

[5] ORS 183.400 provides, in part,

"(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court.

"* * * * *

"(3) Judicial review of a rule shall be limited to an examination of:

if the rule "violates constitutional provisions, exceeds the agency's statutory authority, or was adopted without compliance with applicable rulemaking procedures." *Smith v. TRCI*, 259 Or App 11, 13, 312 P3d 568 (2013) (citing ORS 183.400(4)). The record on review is limited to the rule itself, the statutory provisions authorizing the rule, and copies of documents necessary to demonstrate compliance with the applicable rulemaking procedures. ORS 183.400(3).

ORS 183.335 requires administrative agencies to publish a notice of proposed rulemaking prior to rulemaking, and it sets forth certain requirements for the contents of that notice. The notice must provide "the subject matter and purpose of the intended action in sufficient detail to inform a person that the person's interests may be affected[.]" ORS 183.335(2)(a)(B); *see Assn. of Oregon Loggers v. Dept. of Ins. and Finance*, 130 Or App 594, 596, 883 P2d 859, *rev den*, 320 Or 493 (1994) ("The purpose of the notice of rulemaking is to alert interested persons that the agency's proposed action may have some effect on them."). When a party challenges a rule on the ground of failure to comply with ORS 183.335 notice procedures, we review for whether the rule was adopted in "substantial compliance" with the notice provisions of ORS 183.335. ORS 183.335 (11)(a). "Whether a notice of proposed rulemaking substantially complies with the requirements of ORS 183.335 must be measured against the purpose of the notice[.]" *Oregon Funeral Directors v. Mortuary and Cemetery Bd.*, 132 Or App 318, 323, 888 P2d 104 (1995). We evaluate the "context of the notice as a whole" to determine whether the purposes of ORS 183.335 have been served. *Fremont Lumber Co. v. Energy Facility Siting Council*, 325 Or 256, 262-63, 936 P2d 968 (1997).

---

"(a) The rule under review;

"(b) The statutory provisions authorizing the rule; and

"(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.

"(4) The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions;

"(b) Exceeds the statutory authority of the agency; or

"(c) Was adopted without compliance with applicable rulemaking procedures."

B.   *Substantial Compliance*

The parties' dispute hinges on what is required to "substantially comply" with the notice requirements of ORS 183.335. *See* ORS 183.335(11)(a) ("Except as provided in [a subsection inapplicable to this case], a rule is not valid unless adopted in substantial compliance with the provisions of this section * * *."). We conclude, based upon precedent, that to "substantially comply" with the notice requirements of ORS 183.335, the rule revisions must fall within the general subject matter described in the notice, and the notice must fulfill "the essential matters necessary to assure every reasonable objective of the statute," which will depend on the facts of each case. *N.W. Natural Gas Co. v. Environ. Quality Comm.*, 329 Or App 648, 665, 542 P3d 71 (2023) (citing *Rogers v. Roberts*, 300 Or 687, 691-92, 717 P2d 620 (1986) (internal quotation marks and citation omitted)).

The requirement that the rule revisions fall within the general subject matter described in the notice was first articulated in our decision in *Bassett v. Fish & Wildlife Comm.*, 27 Or App 639, 642, 556 P2d 1382 (1976), in which the rules ultimately adopted by an agency differed from the proposed rules provided in the notice of rulemaking. A divided panel held that the fact that "the adopted rules differ from the proposed rules does not affect the adequacy of the notice" because the adopted rules "did not cover a subject not specified in the notice; the same subject matter * * * was involved in both the proposed and adopted rules." *Id.* We identified two purposes of the notice requirement: (1) to "inform the interested public about intended agency action" and (2) to trigger an opportunity for the agency to "receive the benefit of the thinking of the public on the matters being considered." *Id.* We then explained that agencies may desire to alter proposed rules after receiving public comment, and to require the agency to provide another notice and hearing after each modification of a proposed rule would "produce an unwieldy procedure" and could result in never-ending hearings or agency reluctance to change any of its original proposals "no matter how persuasive the arguments for change offered at the hearing." *Id.*

After *Bassett*, the Supreme Court addressed the doctrine of substantial compliance more broadly. *See Rogers*, 300 Or at 691-92. The Supreme Court acknowledged that although it had "many times used the term 'substantial compliance,' we have never attempted to define it."[6] *Id.* at 691, 691 n 4 (footnote omitted). It went on to define "'substantial compliance' as it pertains to statutes" as follows: "Substantial compliance" can only be defined in "general language," it "requires compliance in respect to the essential matters necessary to assure every reasonable objective of the statute," and "[w]hat constitutes substantial compliance with a statute is a matter depending on the facts of each particular case." *Id.* at 691-92 (internal citations omitted).[7]

Although we did not explicitly cite *Rogers*, we subsequently applied a similar test in cases that implicated the substantial compliance statutory requirement under ORS 183.335(11)(a). In *The Building Department, LLC v. DCBS*, 180 Or App 486, 492-93, 43 P3d 1167 (2002), we invalidated rules for a lack of substantial compliance because the notice did not satisfy the "fundamental notice function" and "overarching objective" of the fiscal impact statement requirement to "allow potentially affected parties to evaluate their positions and understand what information, if any, [the

---

[6] The court cited several examples, including in the context of timeliness of a notice of appeal in workers' compensation law, and notice requirements under the Oregon Tort Claims Act. *Id.* at 691 n 4 (citing *State v. Pottle*, 296 Or 274, 677 P2d 1 (1984) (strict compliance with statutory requirements leading to wiretap order required; substantial compliance was inadequate); *Modoc Lumber Co. v. EBI Companies*, 295 Or 598, 668 P2d 1225 (1983) (substantial compliance with statute allowing notice of appeal to be accomplished by mail was not sufficient to confer jurisdiction where legislature specified compliance as jurisdictional); *Webb v. Highway Division*, 293 Or 645, 652 P2d 783 (1982) (plaintiff substantially complied with Oregon Tort Claims Act notice requirement when proper person received actual notice and purpose of notice statute was satisfied); *Brown v. Portland School Dist. #1*, 291 Or 77, 628 P2d 1183 (1981) (where notice required by Tort Claims Act is actually received by statutorily designated official, statute has been substantially complied with because "the purpose of the statute is served," and notice of claim is valid); *Dowers Farms v. Lake County*, 288 Or 669, 607 P2d 1361 (1980) (where notice required by Tort Claims Act was not received by proper recipient, statute has not been substantially complied with)).

[7] As the Supreme Court has recognized, "[t]he doctrine of substantial compliance has previously been used *** to avoid the harsh results of insisting on literal compliance with statutory notice provisions *where the purpose of these requirements has been met*." *Friends of Columbia Gorge v. Energy Fac. Siting Coun.*, 365 Or 371, 389, 446 P3d 53 (2019) (quoting *Brown v. Portland School Dist. #1*, 291 Or 77, 81, 628 P2d 1183 (1981) (omission in *Friends*; emphasis added)).

agency] might need in order to make an informed decision." (Internal quotation marks omitted.) And in *Oregon Cable Telecommunications v. Dept. of Rev.*, 237 Or App 628, 638, 240 P3d 1122 (2010), we observed that in substantial compliance cases "we have focused on the policy objectives underlying ORS 183.335(2)(b)(E) to determine the adequacy of agency fiscal impact statements," such as the "overarching objective" to "provide protections against arbitrary and inadequately publicized government conduct." Then, in *N.W. Natural Gas Co.*, we explicitly cited the *Rogers* definition of substantial compliance in a case brought under the APA and quoted that analysis as the appropriate consideration for substantial compliance under the APA. 329 Or App at 661, 665.[8]

The agency asserts that in reviewing the sufficiency of a notice under ORS 183.335, we apply the "*Bassett* analysis," which it contends establishes that substantial compliance with rulemaking procedures under the APA requires only that the rules ultimately adopted fall within the general subject matter provided in the notice.[9] However, that interpretation disregards *Rogers* and the proceeding case law cited above. We also reject the agency's argument that *N.W. Natural Gas Co.* is inapplicable because that case ultimately analyzed a statute outside of the APA. Although we ultimately resolved *N.W. Natural Gas Co.* on the basis of compliance with a statute outside of the APA, our discussion of substantial compliance is relevant and applicable here.

---

[8] Additionally, in 2025, in analyzing whether an agency action was a "rule" as defined by the APA, the Supreme Court considered the purposes underlying APA rulemaking and stated that its conclusion was "supported by the purposes underlying the APA's rulemaking requirements and meets the objectives served by those requirements." *Oregon-Columbia Chapter AGC v. ODOT*, 373 Or 405, 408, 567 P3d 1040 (2025). Our precedent thus establishes that substantial compliance requires consideration of the underlying objectives of the notice statute.

[9] The agency also argues that our decision in *City of Cornelius v. Dept. of Land Conservation*, 331 Or App 349, 355, 546 P3d 923, *rev den*, 372 Or 718 (2024), supports its position. In *City of Cornelius*, citing *Bassett*, we upheld the challenged rules because "although the adopted rules differed from the proposed rules, the notice was still adequate because the adopted rules did not cover a subject not specified in the notice." *Id.* at 356. We also "adhere[d] to *Bassett* as industry petitioners have not demonstrated that the decision is plainly wrong[.]" *Id.* (internal quotation marks omitted). Here, however, petitioners do not argue that *Bassett* is plainly wrong, and the meaning of substantial compliance was not at issue in *City of Cornelius*.

Thus, contrary to the agency's assertion, when determining whether an agency "substantially complied" with the notice requirements of ORS 183.335, we consider not only whether the rule revisions fall within the general subject matter described in the notice, but also whether the notice fulfilled "the essential matters necessary to assure every reasonable objective of the statute," which will depend on the facts of each case.[10] *N.W. Natural Gas Co.*, 329 Or App at 665. Therefore, the final step in our determination of the applicable standard of review is to determine the objectives of the statute.

C.   *Objectives of ORS 183.335 Notice Requirements*

In general, the APA notice and comment rulemaking procedures are intended to:

> "(1) permit public scrutiny of agency policy; (2) assure greater public confidence in agency policy making; (3) permit interested parties to be heard in formulating policy; (4) permit the public to know in advance the applicable standards; (5) assure even-handed treatment; (6) provide consistency in internal treatment of cases resolved without litigation; (7) enable parties and decision makers in a contested case to know what facts are critical to the determination; and (8) minimize inconsistent and arbitrary decisions."

*Oregon-Columbia Chapter AGC v. ODOT*, 373 Or 405, 418, 567 P3d 1040 (2025). They are designed to "confine agency discretion to ensure compliance with the rule of law * * * [b]y ensuring that *all* interested parties are heard in formulating the policies embodied in [the rule.]" *Id.* at 420 (emphasis in original).

As explained above, ORS 183.335 sets out the notice and comment procedures for the adoption, amendment, or

---

[10] To the extent that there is any inconsistency in our prior decisions regarding this standard of review, the Supreme Court holding regarding substantial compliance controls. However, we understand the court's definition of substantial compliance to build upon *Bassett* rather than contradict it, and they can thus be read harmoniously.

To the extent that the agency intends to argue that *Bassett* establishes that providing the public with the general subject matter of the rulemaking is the only objective of ORS 183.335, that argument overlooks the objectives stated in *Bassett* itself and cases, including Supreme Court precedent by which we are bound, that came after it.

repeal of administrative rules. An agency is required to give notice to the public of its intended action, and there are requirements for the form and content of that notice. ORS 183.335(1). The notice must include a caption, along with "[a]n objective, simple and understandable statement summarizing the subject matter and purpose of the intended action in sufficient detail to inform a person that the person's interests may be affected, and the time, place and manner in which interested persons may present their views on the intended action." ORS 183.335(2)(a)(B). The requirements of ORS 183.335(2)(a) have been construed to serve two general functions: (1) to "inform the interested public about intended agency action" that may affect their interests and (2) to trigger an agency's opportunity to receive the benefit of public feedback on the proposed action. *Bassett*, 27 Or App at 642.

ORS 183.335(2)(b) sets out in eight subparagraphs other information that the agency "shall include with the notice of intended action," one of which is a "statement of the need for the rule and a statement of how the rule is intended to meet the need[.]"[11] ORS 183.335(2)(b)(C). "[T]he legislature added the statement-of-need requirement to ensure that interested persons could meaningfully participate in the public comment period by 'submit[ting] data and arguments that were responsive to the agency's concerns in proposing the rule or rule change.'" *Friends of Columbia Gorge v. Energy Fac. Siting Coun.*, 366 Or 78, 86, 456 P3d 635 (2020) (quoting *Fremont Lumber*, 325 Or at 262, which engaged in statutory interpretation analysis of the statement of need requirement (brackets in *Friends*)).

Thus, the purposes of the notice statute, as applicable here, include (1) to "inform the interested public about intended agency action" that might affect them, (2) to trigger an agency's opportunity to receive the benefit of public feedback on the proposed action, *Bassett*, 27 Or App at 642, and, regarding the statement of need, (3) to ensure that

---

[11] ORS 183.335(2)(b) contains additional requirements that are not at issue in this case, such as a list of principal documents relied upon by the agency, a fiscal impact statement, and a statement identifying how the rule will affect racial equity. ORS 183.335(2)(b)(D) - (F). Those subsections may have their own purposes that must be considered when analyzing a challenge based on noncompliance with the specific subsection.

interested persons can "meaningfully participate in the public comment period by submitting data and arguments that [are] responsive to the agency's concerns in proposing the rule or rule change," *Friends of Columbia Gorge*, 366 Or at 86 (internal quotation marks omitted).

## III.   ANALYSIS

Applying that standard of review, we conclude that the October 21 notice did not satisfy "every reasonable objective of the statute" and, therefore, did not substantially comply with the ORS 183.335 notice requirements.

## A.   *Subject Matter*

First, we address the agency's argument that because the adopted rules fall within the general subject matter of the notice, the notice substantially complied with the notice requirements. *See Bassett*, 27 Or App at 642. Although we agree that the rules at issue here, which related to trap and transport versus volitional fish passage, are part of the noticed subject matter of the "Fish Passage Rules," as discussed above, that is not the end of our inquiry.[12] We thus proceed to address whether the notice provided here satisfied the purposes of the notice requirement with respect to the challenged rules.

## B.   *Inform Public of Intended Agency Action*

We next determine whether the notice informed the interested public about intended agency action that might affect their interests. *See* ORS 183.335(2)(a)(B); *Oregon Funeral Directors*, 132 Or App at 324. "Informing a person that [their] interests might be affected does not require that exhaustive details of a proposed rule be included in the notice." *Oregon Funeral Directors*, 132 Or App at 324 (citing *Bassett*, 27 Or App at 641-42).

---

[12]  We note that, were the agency correct in its assertion that the only requirement for substantial compliance is that the adopted rules fall under the subject matter stated in the notice, the practical effect would be to incentivize agencies to provide the broadest explanation and least amount of information in the notice to ensure that whatever revisions it made would remain valid. Under that test, the less information given to the public in the notice, the more likely it is that the agency provided the public sufficient notice, undermining the most basic and fundamental purpose of any notice requirement: to notify the public of information.

The notice here informed the public that the agency intended to amend the Fish Passage Rules by providing "clarity on existing standards, establish[ing] new standards, and ensur[ing] alignment with the ODFW Climate and Ocean Change Policy." Because the challenged rules are fish passage rules that either provided clarity on existing standards or established new standards, we conclude that the notice did, generally, inform the public about the intended agency action of amending the rules. Parties with an interest in the Fish Passage Rules would, thus, be informed that their interests "may" be affected. *See* ORS 183.335(2)(a)(B) (notice requires an "objective, simple and understandable statement summarizing the subject matter and purpose of the intended action in sufficient detail to inform a person that the person's interests may be affected").

C.  *Agency's Opportunity to Receive Public Feedback*

Next, we consider whether the notice triggered the agency's opportunity to receive the benefit of public feedback on the proposed action. *Bassett*, 27 Or App at 642. The notice and comment requirements are designed to "confine agency discretion to ensure compliance with the rule of law *** [b]y ensuring that *all* interested parties are heard in formulating the policies embodied in [the rule]"—not just those involved in their creation—and "allows public scrutiny of agency policymaking and opportunities for input, thereby assuring greater public confidence in the process." *Oregon-Columbia Chapter AGC*, 373 Or at 420 (emphasis in original). We conclude that that purpose of the notice statute was not met, even considering, or perhaps especially considering, the "context of the notice as a whole." *Fremont Lumber Co.*, 325 Or at 262-63.

The revisions to the Fish Passage Rules were the subject of a two-year public process that involved numerous stakeholders and meetings. But the record does not show any mention of amendments to trap and transport policies during those two years, not in the public meeting process, the public comment process, the task force meetings, in the notice, or in any of the documents in the December 16 public meeting packet. The only discussion during that two-year public process related to the provisions at issue here

revolved around ensuring that the definition of "fish passage" prohibited delaying fish from moving volitionally, a proposed amendment that would provide greater protection for volitional fish passage.

Actions taken after the revisions became known highlight the need for earlier and sufficient notice. During the public comment period open from August 31 through September 29, 2022, the agency received 175 public comments, none of which commented on amendments to the trap and transport provisions. Although the agency did not receive any public comments between October 21 and November 30 in response to the notice with the original proposed rules, the agency received eight comments after the meeting packet was sent out with the revisions at issue in this case. Most of those comments raised concerns about the revisions made after the noticed amendments. And in one of those comments, a stakeholder specifically recognized and took issue with the revisions to trap and transport policies made in the adopted rules. We disagree with the agency's argument that this demonstrated that the public was provided sufficient notice. *See Oregon Funeral Directors*, 132 Or App at 324 ("[A]s a result of the notice, interested persons did appear at the hearing and present their views to the agency."). Critically, that stakeholder's comment was not in response to the notice. It was triggered by the meeting packet, which was not part of the notice. Further, simply because one party that received the meeting packet crafted a comment on the topic within two-weeks' time to do so does not show that "*all* interested parties" were heard in "formulating the policies embodied in [the rule]," and it certainly does not assure "greater public confidence in the process." *See Oregon-Columbia Chapter AGC*, 373 Or at 420 (emphasis in original).

We address one additional point. At oral argument, the agency stated that it was unaware of the interpretive dispute regarding when trap and transport is authorized until this litigation arose and explained that, had it been aware of that dispute, it may have addressed the issue at a task force meeting or during the rulemaking process. That argument does not aid the agency. Instead, it highlights the

problematic nature of the agency's actions. Had the notice sufficiently informed the public about what topics were being considered, the dispute could have been addressed when it would have been proper to do so: during the rulemaking process.

Every indication prior to the adopted rules included in the December meeting packet was that amendments to trap and transport regulations were *not* "matters being considered." *See Bassett*, 27 Or App at 642 (the notice requirement "triggers the opportunity for an agency to receive the benefit of the thinking of the public on the matters being considered"). Accordingly, the October 21 notice did not satisfy the public feedback purpose of the notice requirements with respect to the challenged amendments.

D.  *Meaningful Participation of Interested Persons*

Finally, we consider whether the notice "ensure[d] that interested persons could meaningfully participate in the public comment period by submitting data and arguments that were responsive to the agency's concerns in proposing the rule or rule change." *Friends of Columbia Gorge*, 366 Or at 86 (internal quotation marks and brackets omitted). Here, the notice did not. After a two-year public process, the agency made significant and substantive changes to the proposed rules that fundamentally altered the purpose of the rules themselves. Revisions of that extent required notice and an opportunity for the public to provide comment. Common sense dictates that the public cannot provide feedback, data, and arguments when it is not notified what to provide feedback, data, and arguments about.

Because the notice contained no indication that the trap and transport provisions would be revised, nor did any context of the notice provide such indication, petitioners were unable to meaningfully participate in the public comment period. They did not submit data and arguments about how the trap and transport provisions do or should function because they had no notice that they needed to.

We note that the notice requirements here also touch on larger issues of respect for the sovereign tribal nations within our state's borders and the importance of

native fish in tribal culture. Native fish are of great importance to many, if not all, of the sovereign tribes in Oregon for cultural, ceremonial, and subsistence reasons. *See State v. Jim*, 81 Or App 177, 179, 725 P2d 365 (1986), *rev den*, 302 Or 571 (1987) (tribe issued "ceremonial fishing permits" which excluded fish caught for ceremonial purposes from state fishing season limitations); *id.* at 185 (Rossman, J., specially concurring) ("Many Indian tribes have reserved hunting and fishing rights which are protected in treaties and other federal agreements or enactments."); *Sohappy v. Smith*, 302 F Supp 899 (D Or 1969) ("[F]ishing provided and still provides an important part of [several Oregon tribes', including the Confederated Tribes of the Umatilla Indian Reservation and Nez Perce Tribe of Idaho] subsistence and livelihood. \*\*\* From the earliest known times, \*\*\* [those tribes] were primarily a fishing, hunting and gathering people dependent almost entirely upon the natural animal and vegetative resources of the region for their subsistence and culture."). The lack of notice here prevented some sovereign nations from being able to fully engage in the process of amending rules that directly impact a significant cultural resource. The lack of notice thus had the effect of depriving people whose interests are historically, culturally, and integrally intertwined with the policies at issue of a role in the process, which is exactly what the notice requirements are designed to prevent.[13]

E.  *Notice Was Required Because the Revisions Were Not Mere Clarifications of the Existing Rules.*

During oral argument, the agency explained that ODFW had been approving trap and transport for some time, and that the 2023 revisions made to the rules were not changes at all but were in fact clarifying and simplifying the already established rules. We reject that characterization of the amendments at issue here.

To be sure, we must defer to an agency's interpretation of its own rules, but only when that interpretation is plausible. *Noble v. Dept. of Fish and Wildlife*, 355 Or 435,

---

[13] Of note, ORS 182.164 requires state agencies to establish a policy that promotes communication, positive relations, and cooperation in development and implementation of agency programs that affect tribes.

448, 326 P3d 589 (2014). An interpretation is plausible only if "it is not inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law." *Id.* at 448-49 (internal quotation marks omitted). Here, it is implausible for the commission to have interpreted the rules prior to the revisions to allow trap and transport in the manner provided for in the amended rules.

In particular, it is implausible that, prior to the 2023 amendments, ODFW had the authority to approve trap and transport as a form of fish passage at an obstruction other than a fish trap under OAR 635-412-0035(6) (Jan 1, 2006) ("Requirements for fish passage at traps"). Under the 2006 rules, "fish passage" required that fish be allowed to move "volitionally" at an artificial obstruction without reference to any exception. OAR 635-412-0005(18) (Jan 1, 2006). The definition of "volitionally" explicitly excluded fish being "trapped, transferred, or handled by any person," with one exception: "unless specifically allowed under OAR 635-412-0035(6)." OAR 635-412-0005(45) (Jan 1, 2006). OAR 635-412-0035(6) (Jan 1, 2006) provided the "Requirements for fish passage at traps" and did not reference any other type of obstruction such as those in OAR 635-412-0035(2) to (5), which provided requirements for fish passage at several other types of artificial obstructions, including dams, bridges, culverts, and obstructions in estuaries and at road-stream crossing structures.[14] Thus, the 2006 rules required volitional fish passage at all artificial obstructions with one exception: "at traps."

In addition, the amendments redefined "fish passage" from the ability of fish "to move volitionally, with minimal stress, and without physical or physiological injury upstream and downstream of an artificial obstruction" to moving "either volitionally or by trap collection and transport if consistent with requirements of OAR 635-412-0035(6), with minimal stress, minimal delay, and without physical or physiological injury upstream and downstream of an artificial obstruction." OAR 635-412-0005(18) (Jan 1, 2006); OAR 635-412-0005(20). At the same time, OAR 635-412-0035(6)

---

[14] "Trap" is defined in the rules as "the set of human-built or operated facilities, structures, devices, or measures that hold fish and prevent them from passing volitionally." OAR 635-412-0005(47).

was amended from "Requirements for fish passage at traps" to "Requirements for fish passage by trap collection and transport." Thus, a plain reading of the rules shows that trap and transport is no longer limited to use "at traps" but is instead an alternative to volitional fish passage without a limit on what type of artificial obstruction at which the method may be used. The agency's interpretation that the 2006 rules provided ODFW with authority to authorize trap and transport *in lieu of* volitional passage at dams or other types of artificial obstructions is, therefore, implausible, and we need not provide it any deference.

Finally, the agency explains that ODFW's process to approve trap and transport was not clearly stated in the 2006 rules, and OAR 635-412-0035(6)(g)—the new provision which authorizes ODFW to approve trap and transport based upon its "professional judgment"—simply clarifies the process that it has already been using. It is irrelevant for our purposes whether ODFW has, in practice, been approving trap and transport based on its "professional judgment." An agency can only act with delegated authority. *SAIF v. Shipley*, 326 Or 557, 561, 955 P2d 244 (1998) ("[A]n agency has only those powers that the legislature grants and cannot exercise authority that it does not have."). An agency must follow its own rules, *Moore v. OSP*, 16 Or App 536, 537, 519 P2d 389 (1974), and may limit its own discretion by adopting rules, *Wyers v. Dressler*, 42 Or App 799, 807, 601 P2d 1268 (1979), *overruled on other grounds by Mendieta v. Division of State Lands*, 148 Or App 586, 598, 941 P2d 582 (1997). Authority to use trap and transport anytime, anywhere, and under any circumstances based on "professional judgment" was not articulated in the 2006 rules; in fact, the rules required volitional fish passage at all obstructions other than traps. The agency cannot rely on conduct in contravention of its own rules to demonstrate a plausible interpretation of those same rules.

Thus, it is implausible to conclude that the 2006 rules could be interpreted to authorize the actions permitted by the 2023 amendments to those rules, so we need not defer to the agency's asserted interpretation of the 2006 rules. The 2023 amendments to the rules expand when trap and

transport is allowed, define it as an alternative to volitional passage rather than as a limited exception, and remove limits on ODFW discretion to use that method. Increasing the use, and possible use, of human intervention does more than simply "clarify" rules that were adopted to protect the ability of fish to move upstream and downstream volitionally, *i.e.* on their own. We therefore reject the agency's assertion that OAR 635-412-0035(6)(g) is a clarification of existing rules.

In sum, agencies are permitted to make further changes to rules in response to public comment during the rulemaking process, and when necessary, should do so. However, when an agency decides to make substantial revisions to the noticed rules on topics that were not identified as relevant to the rulemaking process and topics that fundamentally alter the nature of the rules themselves, the agency must provide new notice and open another comment period to allow meaningful feedback from the public. On this record, the purposes of the notice requirements in ORS 183.335 were not served, and the commission thereby did not substantially comply with the notice and comment procedures.

## IV.   CONCLUSION

In reviewing whether an agency has substantially complied with the notice requirements of ORS 183.335, we evaluate not only whether the rule revisions fall within the general subject matter described in the notice, but also whether the notice fulfilled "the essential matters necessary to assure every reasonable objective of the statute," which will depend on the facts of each case. *N.W. Natural Gas Co.*, 329 Or App at 665. The purposes of the notice statute applicable here include (1) to inform the interested public that an intended agency action might affect them, (2) to trigger the agency's opportunity to receive the benefit of public feedback on the proposed action, and (3) to ensure that interested persons can "meaningfully participate in the public comment period by submitting data and arguments that [are] responsive to the agency's concerns in proposing the rule or rule change," *Friends of Columbia Gorge*, 366 Or at 86 (internal quotation marks and some brackets omitted).

We conclude that the October 21, 2022, notice did not trigger public feedback on the proposed action nor ensure that interested persons could meaningfully participate in the process with respect to the challenged rule amendments. Thus, the agency did not substantially comply with the notice requirements of ORS 183.335, and the challenged rules are invalid.

Amendments to OAR 635-412-0005(20), OAR 635-412-0005(51), and OAR 635-412-0035(6), effective January 1, 2023, held invalid.